CARE INSTITUTE, INC.-ROSEVILLE,
Respondent,

v.

COUNTY OF RAMSEY, Relator.

No. C7–99–1868.

Supreme Court of Minnesota.

June 8, 2000.

Rehearing Denied July 17, 2000.

## OPINION

RUSSELL A. ANDERSON, Justice.

Respondent, Care Institute, Inc.-Roseville (CIIR), an Indiana nonprofit corporation exempt from federal and state income

tax, owns and operates Rosewood Estates of Roseville (RER), an assisted living facility for the elderly. At issue in this case is whether CIIR qualifies as a purely public charity exempt from property taxes for tax years 1996, 1997, and 1998. On CIIR's motion for summary judgment, the Minnesota Tax Court held that because it ruled in 1996 that CIIR qualified as an exempt purely public charity for tax year 1994, the doctrines of res judicata and collateral estoppel prevented the county from relitigating CIIR's entitlement to exempt status.[1] *See Care Inst., Inc.-Roseville v. County of Ramsey*, No. C9–96–10374, 1999 WL 714088, at *5 (Minn. Tax Ct. Sept. 3, 1999). The county petitioned for a writ of certiorari and we now reverse the tax court's grant of summary judgment to CIIR and remand for further proceedings consistent with this opinion.

The facts are taken in the light most favorable to the nonmoving party, the county. *See DLH, Inc. v. Russ*, 566 N.W.2d 60, 72 (Minn.1997). RER is an assisted living facility for the elderly, and part of CIIR's mission is to meet the housing, health and financial security needs of the elderly. In the period 1996 to 1999 base rents ranged from $1,470 to $3,885 per month, considerably higher than rents at comparable facilities that have been granted exempt status. While CIIR set aside two units for reduced or no rent for people unable to pay anything beyond health care charges, and reduced rent for other residents, RER's occupancy rate fluctuated between 83 percent and 100 percent over the period 1996–1999.

Services in the rental agreement include: the apartment, breakfast and evening meals, up to 60 minutes per week of housekeeping, laundry facilities, all utilities except long distance telephone service, basic cable television, facility security system[2], emergency response, social work case management, psychiatric consultation, house physician consultation, weekly nurses mini-clinic, dietary consultation, use of common space for family gatherings, and maintenance. Other services are provided at an additional fee. CIIR receives contributions in the form of volunteer work, reduced administrative and management fees and donations. According to the county, donations amounted to less than two-tenths of one percent (.2%) of total revenue and less than fifteen one-hundredths of one percent (.15%) of assessed market value. RER consistently operates at a significant deficit.

The facility's operation is administered by Care Institute Group, Inc. (Care Group), an Indiana nonprofit corporation that provides administrative services to RER and seven affiliated Care Institute operations around the country. The director of CIIR is on the board of directors for Care Group. The director does not receive director's fees from CIIR, but is compensated through Care Group. Several of the donations claimed by CIIR were in the form of reduced service fees from Care Group and the forgiveness of a loan from CIIR's management company.

I.

On appeal from a grant of summary judgment, this court must determine whether any genuine issues of material fact exist and whether the lower court erred in its application of the law. *See Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). In addition, we review tax court decisions to determine if the decision is supported by the evidence and in conformity with the law, and to determine if errors of law were committed. *See* Minn.Stat. § 271.10, subd. 1 (1998); *Community Mem'l Home at*

---

1. Ramsey County also filed a motion for summary judgment. However, because the tax court found that res judicata and collateral estoppel barred the county's claim, it did not consider the merits of the county's motion.

2. The reason for the security system is that approximately 65 percent of RER residents suffer from Alzheimer's or other forms of dementia.

*Osakis, Minn., Inc. v. County of Douglas,* 573 N.W.2d 83, 86 (Minn.1997) (*Osakis* ). The application of the doctrine of res judicata is a question of law that we review de novo. *See, e.g., BAACT Corp. v. Executive Aero, Inc.,* 312 Minn. 143, 145–46, 251 N.W.2d 107, 109 (1977); *First & Am. Nat'l Bank v. Higgins,* 208 Minn. 295, 319, 293 N.W. 585, 597 (1940). The determination of whether collateral estoppel is available presents a mixed question of law and fact also subject to de novo review. *See Falgren v. State, Bd. of Teaching,* 545 N.W.2d 901, 905 (Minn.1996).

■ In this case the tax court concluded that under the doctrines of res judicata and collateral estoppel the county is barred from relitigating CIIR's status as a purely public charity. Thus, we address whether the tax court committed an error of law in ruling the county was barred from litigating the exemption issue.

## II.

To evaluate the application of res judicata and collateral estoppel, we necessarily review the prior adjudication. In 1996, the tax court found that for tax year 1994 CIIR was a purely public charity under Minn.Stat. § 272.02 (1998). *See Care Inst., Inc. v. County of Ramsey,* No. C9–95–563, 1996 WL 45908, at *3 (Minn. Tax Ct. Feb. 2, 1996). That section sets out property tax exemptions for various public, academic and religious facilities, and includes "institutions of purely public charity." Minn.Stat. § 272.02, subds. 1–8 (1998 & Supp.1999). The term is not defined in statute, but we have described the purpose and practices of a charity:

> The legal meaning of the word "charity" has a broader significance than in common speech and has been expanded in numerous decisions. Charity is broadly defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons "by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or

constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

> But it is not safe to say as a universal rule that any gift which tends to promote man's well-being is a charity.

*Junior Achievement of Greater Minneapolis, Inc. v. State,* 271 Minn. 385, 390, 135 N.W.2d 881, 885 (1965) (quoting 15 Am.Jur.2d Charities § 3).

■ To determine whether an organization qualifies for the public charity exemption, we analyze the following six factors:

(1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward;

(2) whether the entity involved is supported by donations and gifts in whole or in part;

(3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part;

(4) whether the income received from gifts and donations and charges to users produces a profit to the charitable institution;

(5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; and

(6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

*North Star Research Inst. v. County of Hennepin,* 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975). The fifth factor includes consideration of whether the operation diminishes the burden on government. *See Osakis,* 573 N.W.2d at 86–87; *Junior Achievement,* 271 Minn. at 392, 135 N.W.2d at 886. These factors are only

guidelines and an organization may still qualify for an exemption even if all six are not satisfied. *See Care Inst., Inc.–Maplewood v. County of Ramsey,* 576 N.W.2d 734, 738 (Minn.1998) (*Maplewood* ). However, all property is presumed taxable; therefore, the entity seeking exemption bears the burden to prove entitlement. *See Camping & Educ. Found. v. State,* 282 Minn. 245, 250, 164 N.W.2d 369, 372 (1969). "[T]axation is the rule and exemption is an exception in derogation of equal rights," and therefore exemption provisions are to be strictly construed. *Id.*

In 1996, the tax court found that CIIR qualified as a purely public charity. *See Care Inst., Inc.,* 1996 WL 45908, at *3. The court found that CIIR was supported in part by donations and gifts, including contributions from affiliated entities. *See id.* at *4. The court also found that rents were set at a level somewhat below total cost of the benefits provided, meaning that the residents were not required to pay in full for the assistance they received. *See id.* at *5. Further, the court found that because CIIR did not charge an initiation fee, and reduced rents for those unable to pay the full amount, it did not restrict the class of its beneficiaries. *See id.* at *6.

Based on these findings, the tax court concluded in its 1996 decision that CIIR qualified as a purely public charity. The county did not appeal that decision. However, when all exempt properties next came up for reevaluation on the county's three-year schedule, the county proceeded to assess property taxes against CIIR for tax years 1996, 1997 and 1998.[3] CIIR petitioned the tax court for review and the court concluded that res judicata and collateral estoppel barred the relitigation of CIIR's status.

### III.

▇▇▇ Under the doctrine of res judicata, parties to an action may be prohibit-ed from raising any matter in a second suit that was or could have been litigated in the first suit. *See Youngstown Mines Corp. v. Prout,* 266 Minn. 450, 466, 124 N.W.2d 328, 340 (1963). The doctrine applies when the parties to the two actions are the same, the second suit is for the same cause of action, and the original judgment was on the merits. *See id.* Identity of subject matter does not establish that two claims are the same cause of action. *See Maryland Cas. Co. v. Baune,* 184 Minn. 550, 552, 239 N.W. 598, 599 (1931). In addition, if the right to assert the second claim did not arise at the same time as the right to assert the first claim, then the claims cannot be considered the same cause of action. *See Lloyd A. Fry Roofing Co. v. City of Minneapolis,* 551 F.2d 200, 201 (8th Cir. 1977).

▇▇▇ In the instant case, res judicata is inapplicable because the county could not litigate the issue of whether CIIR was a purely public charity in tax years 1996, 1997 or 1998 when the exemption for tax year 1994 was litigated in 1995–96. While these two cases involve the same subject matter and *type* of cause of action, they are not the *same* cause of action; the county is not attempting to collect property taxes CIIR owed for tax year 1994. Rather, the county is attempting to collect taxes for subsequent years, during which the characteristics relevant to status as a purely public charity may have changed. *See* Restatement (Second) of Judgments, § 24, cmt. d, illus. 9 (1982) (annual taxes considered separate obligation of indebtedness; separate actions may be maintained).

Specifically, the extent to which RER is supported by donations, the extent to which residents are required to pay for the assistance received, the profitability and income-producing nature of the institution, and the nature of the beneficiaries are all

---

3. The county also assessed taxes for tax year 1995, and the parties later stipulated to

CIIR's exemption for that year.

characteristics that could change from year to year. *See North Star,* 306 Minn. at 6, 236 N.W.2d at 757. Therefore, the same evidence will not sustain both actions. *See McMenomy v. Ryden,* 276 Minn. 55, 58, 148 N.W.2d 804, 807 (1967). Res judicata does not preclude the county from litigating CIIR's entitlement to an exemption as a purely public charity for tax years 1996, 1997, and 1998.

## IV.

■ The tax court also held that the county was collaterally estopped from relitigating the issue of CIIR's status as a purely public charity. For the doctrine of collateral estoppel to apply, each of the following elements must be met: 1) the issue must be identical to one in a prior adjudication; 2) there was a final judgment on the merits; 3) the estopped party was a party or was in privity with a party to the prior adjudication; and 4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *See Maplewood,* 576 N.W.2d at 737.

■ Our focus in this case is on the first element, whether the issue litigated is identical to the issue litigated in the prior adjudication. In tax cases, the matter in the second suit must be identical in all respects to that in the prior suit, and the controlling facts and legal principles must remain unchanged. *See Tarutis v. Commissioner of Revenue,* 393 N.W.2d 667, 669 (Minn.1986). In addition, estoppel is not lightly applied against the government. *See Brown v. Minnesota Dept. of Public Welfare,* 368 N.W.2d 906, 910 (Minn.1985).

CIIR argues that if the controlling facts changed, they did so in a manner even more favorable to the exemption than in 1994. We need not decide whether only changes in the facts detrimental to the party asserting estoppel prevent relitigation of those facts because here the controlling legal principles have also changed. Specifically, since the 1996 tax court ruling, we have decided two cases clarifying the *North Star* factors as applied

to assisted living facilities such as RER. *See Maplewood; Osakis, supra.* Because the parties have stipulated that CIIR satisfied the first, fourth and sixth *North Star* factors, we limit our review to legal developments relating to factors two, three and five.

The second *North Star* factor addresses the extent to which the entity is supported by donations and gifts. 306 Minn. at 6, 236 N.W.2d at 757. The tax court in 1996 found that donations from related entities to CIIR could be considered donations because courts in the past had not scrutinized motives in making donations. *See Worthington Dormitory, Inc. v. Commissioner of Revenue,* 292 N.W.2d 276, 279 (Minn.1980) (holding that cash donations from president of taxed entity were true donations). However, in 1997 in *Osakis* we distinguished acceptance of a true contribution from a decision to write off the difference between county grant payments and the market rate rents. 573 N.W.2d at 87. A donation from a closely-related entity to keep CIIR afloat is akin to a write-off of an operating shortfall, and this holding from *Osakis* is therefore relevant to the tax court's determination of the exemption in the subsequent action.

As the tax court noted in its 1996 decision, support through donations can be satisfied with minimal contributions. *See Assembly Homes, Inc. v. Yellow Medicine County,* 273 Minn. 197, 201, 140 N.W.2d 336, 341 (1966) (noting that purely public charity received $66 in donations). However, in 1998 in *Maplewood* we indicated that the claimed donations were insufficient to satisfy this element when compared to the land and construction costs and the revenue generated by the facility. 576 N.W.2d at 739. The tax court in 1996 did not compare the contributions to the facility to its value and revenues and the county in this action presented evidence on that issue. Because the controlling legal principles have been further developed in *Maplewood* and *Osakis,* collateral estoppel

as to the second *North Star* factor is inappropriate.

With respect to *North Star* factor three, whether the recipients of the charity are required to pay for the assistance they receive in whole or in part, the legal principles have also been subject to further development. Indeed, this is perhaps the factor that has been most affected by *Osakis*. In the context of analyzing the second *North Star* factor, we clarified that the decision to accept a reduced rate for rent may be more properly characterized as a business decision rather than a charitable donation or gift. *See Osakis*, 573 N.W.2d at 87. This development is particularly relevant here because CIIR alleges that its acceptance of reduced rent satisfies the third *North Star* factor in that it establishes that residents are not required to pay in full for housing and services they receive. In *Osakis*, we held the decision to accept a reduced rent may reflect simply that the facility is not operating at capacity, and because the alternative is to have an empty room contributing no revenue, acceptance of reduced rent is simply a prudent business decision. *Id.*

We also clarified in *Osakis* that operating at a loss is not sufficient evidence to satisfy the third *North Star* factor. *See* 573 N.W.2d at 87. This development is relevant because the tax court in 1996 relied on the facility's operation at a loss to demonstrate that the rents charged by CIIR did not cover the costs of providing the services. *See Care Inst., Inc.*, 1996 WL 45908, at *5. However, rents may not cover costs for a variety of reasons, not necessarily because the facility intends to charge a below-cost rent. CIIR concedes the reason RER has operated at a loss is not because CIIR planned to charge residents below-cost rents. CIIR stipulated that the financial losses were the result of low occupancy rates. *Osakis* clarified that operating at a loss does not establish that residents do not pay for the services they receive, which the tax court in 1996 did not

address, and application of collateral estoppel is therefore inappropriate.

Finally, *Osakis* also clarified the interpretation of the fifth *North Star* factor, which includes consideration of whether the petitioner lessens the burden on the government. In *Osakis*, we held the facility did not satisfy the fifth factor because the record did·not show that the facility's intended purpose was to provide housing and services for the economically disadvantaged or that it will continue to do ·so in the future. *Id.* at 88.

■■■ This holding is relevant to the collateral estoppel analysis because CIIR argues that it is committed to helping the elderly regardless of their financial status. CIIR points to the fact that it has set two units aside for residents who cannot afford to pay the rental price, has reduced the rent for other residents when they have been unable to pay the full rent, and has not evicted residents. While these are commendable practices, the word "purely" in "purely public charity" means "wholly," "solely," and "exclusively." *Camping and Educ. Found.*, 282 Minn. at 252, 164 N.W.2d at 374 (quoting *State v. Willmar Hosp.*, 212 Minn. 38, 41, 2 N.W.2d 564, 566 (1942)).

The county presented evidence that suggests that CIIR's goal is to operate RER at full capacity, and donations from affiliated entities are made on an as-needed, rather than permanent basis. From the evidence presented the tax court could find that CIIR's long-term goal is to operate at full capacity with rents covering expenses. In *Osakis* we clarified that the relevant inquiry is into the long-term philosophy of providing services to the economically disadvantaged, 573 N.W.2d at 88, which is a development in the applicable law that precludes application of collateral estoppel as to the fifth *North Star* factor.

Because the controlling law has changed since the 1996 tax court judgment, the tax court committed an error of law in apply-

ing collateral estoppel to the issues presented.

### V.

The tax court did not reach the substance of the county's motion for summary judgment because it granted CIIR summary judgment based on res judicata and collateral estoppel. Because we reverse that decision, we leave for the tax court the application of the developments in the law described above to the county's motion for summary judgment. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988). We remand for further proceedings consistent with this opinion.

Reversed and remanded.