Wayne HAUSCHILDT,
et al., Appellants,

v.

Dennis J. BECKINGHAM,
et al., Respondents.

No. A03–218.

Supreme Court of Minnesota.

Sept. 16, 2004.

Vernon J. Vander Weide, Thomas V. Seifert, Head, Seifert & Vander Weide, Eric J. Magnuson, Rider Bennett Egan & Arundel, LLP, Minneapolis, MN, for Appellant.

Thomas J. Lyons, Thomas J. Lyons & Associates, P.A., Thomas J. Lyons, Jr., Consumer Justice Center, P.A., Little Canada, MN, Guy M. Burns, Jonathan S. Coleman, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, FL, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

In October 2002, plaintiff-appellants Wayne Hauschildt and Patti Richmond Hauschildt, former depositors in the West Publishing Employees' Preferred Stock Association, commenced an action on behalf of themselves and others similarly situated against defendant-respondents who were officers of the association's Governing Board. The Hauschildts' complaint concerned events in late 1998. They allege that the officers failed to timely bring claims related to an allegedly improper 1992 dividend distribution, thus allowing the statute of limitations to expire. The Hauschildts' action is related to an earlier class action, *Davies v. West Publishing Co.*, in which the Hauschildts were named parties and class members. In a 2001 decision rendered in *Davies*, the Minnesota Court of Appeals answered three certified questions allowing the statute of limitations to be asserted against claims based on 15 dividend distributions the association made from 1967 to 1993. Citing the decision in *Davies*, the officers moved to dismiss the Hauschildts' action under Minn. R. Civ. P. 12.02(e). The Dakota County

District Court granted the officers' motion to dismiss after finding, *inter alia,* that under collateral estoppel and res judicata, the effect of the earlier *Davies* judgment was to bar the Hauschildts' action. The court of appeals reversed. We affirm the court of appeals.

The West Publishing Employees' Preferred Stock Association (WPSA) was an unincorporated voluntary association formed in 1913. From the outset, membership in WPSA was limited to West employees. Employees were considered WPSA members even if they had no active account or had no funds on deposit with WPSA. A governing board made investment decisions for WPSA. The eight-member board consisted of six officers, who were usually senior West executives, and two other members elected at the WPSA annual meeting.

West employees could deposit money with WPSA through payroll deductions and receive a variable interest rate on their deposits. WPSA earnings in excess of that distributed as interest to depositors resulted in an unallocated surplus from which dividends were occasionally distributed. Initially, WPSA distributed these dividends on a pro rata basis that was determined by the balance of each member's account. This practice changed in 1967 when WPSA began to pay dividends to *all* members without regard to whether they had deposit balances or whether they had ever made any deposits. Sixteen of these per capita distributions were made between 1967 and 1996 in amounts between $100 and $250 per member. Each distribution was accompanied by a written

disclosure that the same dollar amount dividend was being paid "to every Association member in the permanent employ of West Publishing Company or West Services, Inc."

The last two per capita distributions were made on December 18, 1992 and November 29, 1996 in the amounts of $150 and $250 per member, respectively. The record indicates that the 1992 and 1996 distributions collectively totaled over $2.2 million. Of this $2.2 million, over $1 million was paid to West employees who had no deposits. Approximately $370,000 was paid to certain depositors in excess of the amount they would have received had the dividends been distributed on a pro rata basis. *See, e.g.,* Minn.Stat. § 50.17 (1994) (requiring, in part, that distributions to members of a savings bank's surplus be made pro rata).[1] The 1992 distribution totaled $749,100 and was given to 4,994 members. The 1996 distribution totaled $1,479,750 and was given to 5,919 members.

In 1996, West was acquired by The Thomson Corporation. At some time after the acquisition and merger, West and WPSA's board retained outside counsel to review the history and purposes of WPSA. At an October 1, 1998 WPSA board meeting, outside counsel advised the board that WPSA was operating in possible violation of state and federal regulations for financial and/or savings institutions. Counsel also advised the board that WPSA should have made the unallocated surplus distributions pro rata in accordance with the deposits rather than per capita. Counsel

1. Minnesota Statutes § 50.17, subd. 1, previously required the board of every savings bank with a surplus of 15 percent of its deposits to, at least once every three years, "divide *proportionately* the excess among its depositors as an extra dividend." Minn.Stat. § 50.17, subd. 1 (1994) (amended 1995) (em-

phasis added). This requirement to pay the excess to depositors pro rata was eliminated following a 1995 amendment. The new language of § 50.17 does not discuss the distribution of surplus. *See* Minn.Stat. § 50.17 (Supp.1995).

told the board that six years appeared to be the longest applicable statute of limitations for any claims arising from the failure to make the distributions pro rata. At this same meeting, the board adopted a resolution detailing how the unallocated surplus would be distributed and proposing to members that WPSA be dissolved.

Two weeks later, on October 15, 1998, the WPSA board held a special meeting. At this meeting, outside counsel advised the board that "WPSA should have from time to time in the past distributed some part of its unallocated surplus in accordance with deposits, but WPSA did not do so." The board then refined the distribution plan adopted at the October 1 meeting and adopted resolutions that superceded the October 1, 1998 resolutions.

The next day, October 16, WPSA held its annual meeting. Approximately 60 people attended this meeting. The meeting's minutes reflect that Board President Dennis Beckingham—a West Executive Vice President, West's Chief Financial Officer, and one of the defendants in the case at bar—"commented about the status" of WPSA. According to the minutes, Beckingham explained that WPSA had been started before there were any state or federal laws governing such investment organizations. He stated that the board had learned that WPSA was "not in compliance with current laws regulating these types of organizations." He also stated that the board had requested help from outside counsel to bring WPSA into compliance with the law and to investigate dissolution

of the association. Beckingham also "assured the members that their money is *not* at risk."

In response to questions from members, Beckingham explained that the dissolution process may take from three to six months depending on federal and state regulatory agencies, and that the board "has bent over backwards to recommend a plan [for distribution of funds] that is fair and equitable to all members." When asked if there could be penalties for noncompliance, Beckingham replied that the board did not know, but it "hope[d] this will be viewed as an honest mistake. Although [WPSA] is not in compliance with the law, members have benefited from its operation. The Board inherited this situation and is taking prudent action." In response to other questions, Beckingham stated that about 2,600 members used WPSA,[2] and the distribution of any existing surplus would go only to those with balances on certain record dates "over the past 6 years." The minutes of the annual meeting do not indicate whether members were told at any time during the meeting specifically how WPSA was not in compliance with the law or whether members were told that the past per capita distributions were improper.

Following the annual meeting, Beckingham, in an October 30 letter to WPSA members, again addressed the status of WPSA and issues related to its dissolution. Beckingham again assured members that their individual funds were not at risk and stated that the board "has had and will

2. According to a December 10, 1998 letter to the Commissioner of Commerce from WPSA's outside counsel, all West employees were members of WPSA. Beckingham's "2,600" figure roughly corresponds to the number of employees—2,515—with deposits rather than all actual members.

As of October 31, 1998, WPSA had assets of approximately $20.2 million, of which ap-

proximately $11.4 million was attributable to deposit balances, with the remaining $8.8 million being unallocated surplus. At that time, there was a total of 4,725 WPSA members. Of these, there were 2,515 (53%) with balances on accounts totaling $11.4 million, including accrued interest, and 2,210 (47%) with account balances of zero.

continue to have the best interests of the members in mind during any dissolution or merger process." The only information in the letter regarding why dissolution had been proposed was a repetition of the statements made at the annual meeting that WPSA was established in 1913 and that the board recently discovered that WPSA "does not comply with current laws regulating such organizations."

WPSA's outside counsel sent a letter, dated December 10, 1998, to the Minnesota Commissioner of Commerce. The letter described the nature of WPSA's noncompliance and proposed various steps to either bring WPSA into compliance or to dissolve the association. The letter requested that the commissioner take no action against WPSA. Six months later, pursuant to a June 18, 1999 consent decree with the commissioner, WPSA ceased operation and paid a $100,000 penalty to the state.

*The Davies Litigation*

On June 14, 1999, Lawrence K. Davies, a former West employee, commenced a class action in Dakota County District Court naming West Publishing Company as the defendant. Davies alleged that West controlled and operated WPSA. Davies asserted that WPSA was a de facto trust controlled by West for the benefit of employee depositors and therefore West was required to disclose its noncompliance with various regulations. Davies also claimed that West used WPSA funds to make below market-rate loans to itself that were a benefit to West, but a loss to WPSA. Davies further alleged that West had withheld material information about WPSA's operation from depositors and that the WPSA surplus was being used to fund periodic all-employee bonuses via the per capita distributions.

Davies' complaint enumerated three specific counts against West. The first count was for a breach of fiduciary duty. Davies asserted that West "(1) failed to report to WPSA depositors how WPSA's funds were invested; (2) failed to disclose to WPSA depositors that they were entitled to profits and gains beyond the published interest rate; and (3) failed to pay depositors the profits and gains resulting from the investments on a pro rata basis." The second count demanded an accounting to WPSA depositors of how WPSA's funds were invested and used. The third count articulated a cause of action based on West's alleged conversion of WPSA funds for its own use. Although WPSA was not named as a defendant by Davies in his initial complaint, WPSA and West filed a joint answer to the complaint and jointly counterclaimed for a declaratory judgment and dismissal of the complaint.

During the *Davies* litigation, the district court certified three questions to the Minnesota Court of Appeals. How the court of appeals ruled on these questions is of central importance in evaluating the appeal that is currently before us. The issues presented via the certified questions were: (1) whether WPSA's per capita distributions were exempted from statutes of limitations; (2) if the statute of limitations applied, then whether the continuing violations doctrine tolled the statute of limitations; and (3) if the continuing violations doctrine did not apply, then whether equitable estoppel tolled the statute of limitations. *Davies v. West Publ'g Co.*, 622 N.W.2d 836, 840 (Minn.App.), *rev. denied* (Minn. May 29, 2001). The court of appeals answered the certified questions to the effect that (1) the WPSA distributions were not exempted from statutes of limitations; (2) each distribution was independent and therefore a continuing violation did not exist to toll the statute; and (3) equitable estoppel did not apply because information regarding the nature and

source of the distributions accompanied each distribution and thus there was not actionable misrepresentation as to the source or nature of the distributions. *Id.* at 842–43. Based on the court of appeals' decision, the district court, on November 7, 2001, granted West and WPSA's "request for partial summary judgment that any claims concerning the distributions by [WPSA] that took place before June 11, 1993 are barred by the statutes of limitation."

*The Hauschildt Litigation*

Appellants Wayne Hauschildt and Patti Richmond Hauschildt are former long-term employees of West who had made deposits into WPSA. The Hauschildts are also named plaintiffs and class members in the *Davies* litigation. In October 2002, the Hauschildts commenced a putative class action naming the 1998 WPSA board officers individually as defendants. The Hauschildts claim that the officers breached their fiduciary and other duties by allowing "statutes of limitations to run and fail[ing] to pursue valid claims against West Publishing Company or the predecessor Officers of WPSA on behalf of the [p]laintiffs."

The Hauschildts allege that the officers' employment by West created a potential conflict of interest with their duties as WPSA board members. The Hauschildts also assert that the board "improperly used WPSA surplus funds for the benefit of West" by "declar[ing] periodic bonuses"—i.e., the per capita distributions—to all West employees. They claim that the purpose of the bonuses was "to engender good will and loyalty toward West." The Hauschildts allege that the officers had actual notice that the distributions violated state and federal laws based on information and advice presented by the board's outside counsel at the board meetings on October 1 and 15, 1998. They also contend

that despite having actual notice that claims existed, the officers failed to commence legal action against West or former WPSA officers regarding the 1992 distribution. The Hauschildts assert that this failure allowed the six-year statute of limitations on the 1992 distribution to expire before the depositors themselves could bring an action. It is their position that the officers' failure to act was "driven by the [officers'] irreconcilable conflict of interest," whereby the officers sought to protect West from exposure to liability. The Hauschildts note that the board specifically announced to regulators that WPSA would not seek to recover any of the improper distributions.

The Hauschildts complain that the WPSA board never disclosed to its members the following material information: (1) that WPSA's per capita distributions were illegal; (2) that the statute of limitations was running against claims related to those distributions; (3) that the board had waived any right to seek disgorgement; (4) that the board would make no effort to seek restoration of the improper distributions; and (5) that the officers had "an irreconcilable conflict of interest between their loyalty to their employer, West, and WPSA's members." The Hauschildts contend these "omissions and misrepresentations were negligent, reckless, and/or fraudulent."

The Hauschildts presented three counts in their complaint focusing on the officers' actions in 1998. Their first count is a cause of action for a breach of fiduciary duty by the officers in failing to timely pursue claims and placing their own interests before those of WPSA depositors. The second count is a cause of action for negligence and gross negligence. The Hauschildts assert that the officers, as a quorum of the board, owed and breached a duty of due care, good faith, and fair deal-

ing, which included, without limitation, specific duties to pursue a claim against West and to keep WPSA members informed of the association's illegal operations. The third count articulates a cause of action for misrepresentation by omission. The Hauschildts assert that the officers had special access to facts surrounding the potential claims and failed to tell the Hauschildts of the material facts that legal claims existed, that the statute of limitations was running, and that the officers and the board were taking no action. The Hauschildts' action was assigned to the same district court judge to whom the *Davies* action had been assigned.

The officers moved to dismiss. The district court granted this motion with prejudice. The court, adopting much of the officers' memorandum as its own, found that the Hauschildts were collaterally estopped from making any claims based on the 1992 distribution because such claims were barred by the statute of limitations. It also found that the Hauschildts could not assert that the statute of limitations was tolled or that the officers are estopped from asserting such a defense as "[t]hese issues were litigated in *Davies* and were resolved against plaintiffs." The court noted that its own order for partial summary judgment in *Davies* barred "any claims" without regard against whom they may be asserted.

The court of appeals reversed. *Hauschildt v. Beckingham*, 668 N.W.2d 916, 920 (Minn.App.2003). The court of appeals held that, despite its holding in *Davies*, collateral estoppel fails to apply "because the parties are neither the same nor in privity with one another." *Id.* at 919. The court also noted that while the issues in *Davies* and this case are predicated on similar facts, they are not identical. The court said:

In the *Davies* case, the cause of action was primarily for breach of duty in making the distributions themselves. * * * The present case is for breach of duty, negligence, and gross negligence in failing to act in WPSA depositors' best interests, specifically including an alleged cover-up in 1998 to shield past improprieties.

*Id.* Thus, the court held, "res judicata fails because the causes of action are different in the two cases." *Id.* The court also noted that the district court's conclusions on other issues—e.g., the existence of a fiduciary relationship—were premature and more properly addressed after completion of discovery. *Id.* We granted the officers' petition for review as to the preclusive effect of the partial summary judgment in *Davies*.

## I.

When reviewing a dismissal for failure to state a claim upon which relief can be granted under Minn. R. Civ. P. 12.02(e), we consider whether the complaint sets forth a legally sufficient claim for relief. *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003). Our standard of review is de novo. *Id.* In evaluating a district court's ruling on a Rule 12.02(e) motion, "we will not uphold a * * * dismissal 'if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded.'" *Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 739–40 (Minn.2000) (quoting *Northern States Power Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963)).

The district court dismissed the Hauschildts' complaint on the grounds that the statute of limitations barred claims related to the 1992 distribution. The court then found that res judicata and collateral estoppel barred the Hauschildts from argu-

ing that the statute of limitations was tolled.

 Res judicata and collateral estoppel are related doctrines. Fundamental to both doctrines "is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction * * * cannot be disputed in a subsequent suit between the same parties or their privies * * *.'" *Kaiser v. Northern States Power Co.,* 353 N.W.2d 899, 902 (Minn.1984) (quoting *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Although the terms are sometimes used interchangeably, each doctrine is distinct in its effect. Res judicata, also known as "claim preclusion," while based on the same principle as collateral estoppel, is the broader of the two and applies more generally to a set of circumstances giving rise to entire claims or lawsuits. Bryan A. Garner, *A Dictionary of Modern Legal Usage* 169 (2d ed.1995). Once there is an adjudication of a dispute between parties, res judicata prevents either party from relitigating claims arising from the original circumstances, even under new legal theories. *Wilson v. Comm'r of Revenue,* 619 N.W.2d 194, 198 (Minn.2000); *Hauser v. Mealey,* 263 N.W.2d 803, 806–07 (Minn.1978). Collateral estoppel, characterized by Garner as being "a miniature of res judicata," applies to specific legal issues that have been adjudicated and is also commonly and accurately known as "issue preclusion." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 169; *see also Ellis,* 319 N.W.2d at 703 n. 3, 704; *Hauser,* 263 N.W.2d at 806.

 We have observed that neither res judicata nor collateral estoppel is to be rigidly applied. *Wilson v. Comm'r of Revenue,* 619 N.W.2d 194, 198 (Minn.2000); *Johnson v. Consol. Freightways, Inc.,* 420 N.W.2d 608, 613 (Minn.1988). Instead, the focus is on whether their application would work an injustice on the party against whom the doctrines are urged. *Johnson,* 420 N.W.2d at 613–14. In particular, the United States Supreme Court has cautioned that res judicata should be invoked only after careful inquiry because it "may govern grounds and defenses not previously litigated" and therefore "blockades unexplored paths that may lead to truth." *Brown v. Felsen,* 442 U.S. 127, 132, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

## II.

 Whether collateral estoppel precludes litigation of an issue is a mixed question of law and fact that we review de novo. *Care Inst., Inc.-Roseville v. County of Ramsey,* 612 N.W.2d 443, 446 (Minn. 2000) (CIIR). For collateral estoppel to apply, all of the following prongs must be met:

> (1) the issue must be identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or was in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Id.* at 448.

 Here, the pivotal question is whether the issues decided in *Davies* are identical to any issue raised in the Hauschildts' cause of action such that all or part of the Hauschildts' action is collaterally estopped. The issue on which collateral estoppel is to be applied must be the same as that adjudicated in the prior action and it must have been necessary and essential to the resulting judgment in that action. *Ellis v. Minneapolis Comm'n on Civil Rights,* 319 N.W.2d 702, 704 (Minn.1982); *Hauser,* 263 N.W.2d at 808. The issue must have been distinctly contested and

directly determined in the earlier adjudication for collateral estoppel to apply. *See Kaiser*, 353 N.W.2d at 902.

■ As the motion to dismiss was argued by the officers and decided by the district court in *Davies*, the relevant determination by the court of appeals was that equitable estoppel did not toll the six-year statute of limitations on claims arising from each per capita distribution. *Davies*, 622 N.W.2d at 843. The court of appeals noted that a necessary element of equitable estoppel is a misrepresentation and then explained that

> there are no facts in the record to establish a misrepresentation with regard to WPSA's distribution of surplus funds. The record indicates that all WPSA depositors received letters with each distribution, informing them that (1) the distributions were being paid out of money earned from successful investment of WPSA funds; (2) all full-time West employees were members of WPSA; and (3) the same distribution amount was being paid to all WPSA members. Thus, all members of respondent class had notice that all full-time West employees were receiving the same amount of money, earned from WPSA investments, regardless of whether they had deposited money with WPSA. These undisputed facts lead us to conclude as a matter of law that there was no actionable misrepresentation regarding the nature or source of the challenged distributions. Therefore, the doctrine of equitable estoppel does not apply to toll the statute of limitations.

*Id.* at 842. Thus, the court of appeals has determined that each distribution did not involve misrepresentation by WPSA. Undoubtedly, the identical issue prong of collateral estoppel would apply if the Hauschildts also were asserting that the WPSA officers misrepresented the nature and source of the 1992 distribution. However, this is not the case here.

The officers contend that key underlying factual issues were resolved against the Hauschildts and other class members in *Davies*. This contention focuses on the court of appeals' conclusion in *Davies* that there was no actionable misrepresentation concurrent to each distribution. *Id.* The officers have attempted to extend the reach of this conclusion. They assert that there could be no subsequent "cover-up" by the board regarding the 1992 distribution because the Hauschildts were "not uninformed" as to the nature of the individual distributions. The officers emphasize that the Hauschildts were constructively "aware of their injury" at the time of the 1992 distribution and could have commenced their suit at that time. Arguing that the Hauschildts' "core allegation" is that depositors were uninformed as to the nature and source of the per capita distributions, the officers assert that this allegation is the same as in *Davies*. Notably, the officers do not argue against the merits of the Hauschildts' claim for recovery of the improperly made distributions—only that the claim on the 1992 distribution is now barred by the expiration of the statute of limitations.

Insofar as the statute of limitations is concerned, the Hauschildts are not making a claim on the 1992 distribution. Instead, the Hauschildts assert that the failure of the officers in 1998 to bring an action on behalf of depositors resulted in no legal action being commenced before the expiration of the statute of limitations. In essence, the issues raised by the Hauschildts concern the officers' acts and omissions starting in October 1998. The Hauschildts assert that in 1998 a claim existed against West and the WPSA board for the recovery of the money improperly distributed in 1992. They argue that the officers chose

not to take legal action and failed to disclose to depositors the full nature of WPSA's noncompliance and that the statute of limitations was about to expire for any claims on the 1992 distribution. The Hauschildts specifically complain that in 1998 the officers breached their fiduciary duty to depositors, that the officers' acts and omissions in 1998 constituted negligence and gross negligence, and that the officers are liable for their 1998 misrepresentation by omission. They assert that the officers' "withholding of material information made it impossible for WPSA depositors to make knowing and informed choices as to their claims against West and WPSA's 1992 Governing Board." As demonstrated by the court of appeals' opinion, these issues were not distinctly contested or directly determined by the court in *Davies*. *See* 622 N.W.2d at 842–43. Nor were these issues necessary and essential to the *Davies* decision.

■ With respect to the issues raised by the Hauschildts, if a valid claim on the 1992 distribution existed in 1998, then the 1992 distribution serves only as a measure of damages for the Hauschildts' claim and not as their claim in and of itself. The determination in *Davies* that the statute of limitations on the 1992 distribution expired in December 1998 does not affect the Hauschildts' present claim that the officers' 1998 acts and omissions prevented the Hauschildts from timely filing a claim on the 1992 distribution. In this sense,

the Hauschildts' claim against the officers as fiduciaries is analogous to a claim of legal malpractice. In a legal malpractice claim, one element concerns the defendant attorney's negligence or breach of contract in representing the plaintiff in a claim against a third party. *Christy v. Saliterman*, 288 Minn. 144, 150, 179 N.W.2d 288, 293–94 (1970). A second necessary element is that, but for the attorney's conduct, the former client would have been successful in the prosecution or defense of the claim against the third party. *Id.* at 150, 179 N.W.2d at 294. Applying these concepts, a claim stemming from the 1992 distribution represents the case-within-a-case that the Hauschildts must prove in order to succeed in their action against the officers. *See Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 409–10 (Minn.1994).

Finally, we note that the officers' argument, that they are not liable because the Hauschildts constructively knew of the existence of a claim on the 1992 distribution, is not persuasive. The officers, who were sophisticated executives from a premier legal research and information business, imply that even they did not know of the basis for the claims until October 1998. Given this position, it is difficult for the officers to assert that the Hauschildts reasonably should have had the knowledge that the officers concede that even they did not have.[3]

For all the foregoing reasons, we conclude that the issues raised in the Haus-

3. We recently noted that an analogous concept—that everyone is presumed to know the law—"does not necessarily apply [as a defense for] a fiduciary, who may have an expanded obligation to inform the beneficiary of the legal implications of their dealings." *Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771, 778 (Minn.2004). This treatment of fiduciary relationships is also illustrated by our decision in *Toombs v. Daniels*, 361 N.W.2d 801 (Minn.1985). In *Toombs*, a fiduciary attempted to assert a statute of limitations defense, but we held that the statute of limitations was tolled by the fiduciary's withholding from the beneficiary facts that a possible legal right existed and that the fiduciary had elected not to seek a court determination of those rights. *Id.* at 809–10. Our reference to fiduciaries does not predetermine that there was a fiduciary-beneficiary relationship. Because of the posture in which this case came to us, we are assuming for purposes of the motion to dismiss that the Hauschildts' allegations to that effect are true.

childts' complaint are not the same as those adjudicated in *Davies*. Thus, we conclude that the Hauschildts' action is not barred by collateral estoppel. Therefore, we hold the district court erred when it dismissed the Hauschildts' action under collateral estoppel.

### III.

As an alternative argument to collateral estoppel, the officers contend that res judicata bars the Hauschildts' claim. Whereas collateral estoppel concerns issues that were actually litigated, determined, and were essential in a prior action, res judicata concerns circumstances giving rise to a claim and precludes subsequent litigation—regardless of whether a particular issue or legal theory was actually litigated. *Hauser*, 263 N.W.2d at 806–07. Res judicata is a finality doctrine that mandates that there be an end to litigation. *Dorso Trailer Sales, Inc. v. Am. Body & Trailer, Inc.*, 482 N.W.2d 771, 773–74 (Minn.1992). Under res judicata, a party is "required to assert all alternative theories of recovery in the initial action." *Id.* at 774. Res judicata not only applies to all claims actually litigated, but to all claims that could have been litigated in the earlier action. *State v. Joseph*, 636 N.W.2d 322, 327 (Minn.2001). In *Youngstown Mines Corp. v. Prout*, 266 Minn. 450, 466, 124 N.W.2d 328, 340 (1963) (quoting *Veline v. Dahlquist*, 64 Minn. 119, 121, 66 N.W. 141, 142 (1896)), we stated:

> A judgment on the merits constitutes an absolute bar to a second suit for the same cause of action, and is conclusive between parties and privies, not only as to every matter which was actually litigated, but also as to every matter which might have been litigated therein.

Application of res judicata to preclude a claim is a question of law that we review de novo. *CIIR*, 612 N.W.2d at 446. Res judicata applies as an absolute bar to a subsequent claim when (1) the earlier claim involved the same set of factual circumstances; (2) the earlier claim involved the same parties or their privies; (3) there was a final judgment on the merits; (4) the estopped party had a full and fair opportunity to litigate the matter. *Joseph*, 636 N.W.2d at 327; *accord Wilson*, 619 N.W.2d at 198. All four prongs must be met for res judicata to apply. *See Joseph*, 636 N.W.2d at 327–29.

Here, the first prong is determinative. With regard to this prong, we have explained that "a plaintiff may not split his cause of action and bring successive suits involving the same set of factual circumstances." *Hauser*, 263 N.W.2d at 807. Central to considering this prong is what is meant by "claim" or "cause of action." A claim or cause of action is "a group of operative facts giving rise to one or more bases for suing." *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 9 (Minn.2002) (quoting *Black's Law Dictionary* 214 (7th ed.1999)). The two terms can be used interchangeably. *See Black's Law Dictionary* 214 (7th ed.1999). Therefore, the focus of res judicata is whether the second claim "arise[s] out of the same set of *factual circumstances.*" *Hauser*, 263 N.W.2d at 807 (emphasis added); *see also Meagher ex rel. Pension Plan v. Bd. of Trustees of Pension Plan*, 921 F.Supp. 161, 167 (S.D.N.Y.1995) (stating "the *facts* surrounding the occurrence which constitutes the cause of action—not the legal theory upon which [plaintiff] chose to frame his complaint—must be identical in both actions to trigger res judicata." (emphasis in original), *aff'd*, 79 F.3d 256 (2d Cir.1996)).

The "common test for determining whether a former judgment is a bar to a subsequent action is to inquire whether the same evidence will sustain

both actions." *McMenomy v. Ryden,* 276 Minn. 55, 58, 148 N.W.2d 804, 807 (1967). In addition, claims cannot be considered the same cause of action if "the right to assert the second claim did not arise at the same time as the right to assert the first claim." *CIIR,* 612 N.W.2d at 447.

Here, the evidence that would sustain the Hauschildts' present action would be the same as in *Davies* only to the extent that the propriety of the 1992 distribution is a common question. Entirely different evidence is necessary to sustain the Hauschildts' claim that the officers' 1998 acts and omissions were a breach of fiduciary duty, negligence, or a misrepresentation by omission. Indeed, in *Davies,* the court of appeals' discussion regarding the statute of limitations did not consider any facts or circumstances from 1998. *See Davies,* 622 N.W.2d at 839, 842. Moreover, the right to assert a claim based on the 1998 acts and omissions arose after the right to a claim arose based on the 1992 distribution. Therefore, we conclude that res judicata does not apply to the Hauschildts' claim against the officers. Accordingly, we hold that the district court erred when it dismissed the Hauschildts' claim under res judicata.

Affirmed.