**AFTON HISTORICAL SOCIETY PRESS, Relator,**

v.

**COUNTY OF WASHINGTON, Respondent.**

No. A07–3.

Supreme Court of Minnesota.

Dec. 13, 2007.

Richard M. Gaalswyk, Cottage Grove, MN, for Relator.

Doug Johnson, Washington County Attorney, Kari A. Lindstrom, Richard D. Hodsdon, Assistant County Attorneys, Stillwater, MN, for Respondent.

## OPINION

PAGE, Justice.

In this case, we review the final order of the Minnesota Tax Court denying an exemption from payment of real property taxes assessed in 2003, 2004, and 2005 for property owned by Afton Historical Society Press (Afton), a publishing house. Afton sought the exemption as an institution of purely public charity under Minn.Stat. § 272.02, subd. 7 (2006). The tax court, applying the six factors we set forth in *North Star Research Institute v. County of Hennepin*, 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975), denied Afton the exemption for the tax years in question. We reverse.

Afton is a Minnesota nonprofit corporation under Minn.Stat. ch. 317A that publishes books about Minnesota history and culture. Its articles of incorporation require it to "be operated exclusively for charitable and educational purposes." Afton's mission statement states:

> The Afton Historical Society Press publishes regional books that explore and celebrate Minnesota culture and history. All of our books, including our books for young people, adhere to high standards of scholarship, literary value, design, and production.
>
> We seek out the largest possible local, national, and international audience for our books through wholesale and retail outlets.
>
> We provide books and curriculum packages free-of-charge to schools and public libraries through donor programs, including our *Books–for–Schools* program.
>
> We also promote and extend the reach of our publications with author programs and events, museum exhibitions, and public television documentaries.

Afton typically creates and develops the idea for the book, finds an author, editor, and illustrations for the book, raises the necessary funding, ushers the book through all stages of the publishing process, and publicizes and markets the book upon completion.

Afton sells its books through its catalog, through the internet, and by working with book distributors that market its books to libraries and retailers, although the price Afton sets for each book covers less than half of the cost of publication. Afton also publishes learning and activity books on various topics that, along with other Afton publications, are donated to schools in Minnesota through its Books–for–Schools program. Afton also produces a number of books on a contract basis. Revenues from these contract publishing ventures are used to support Afton's general operations. During the years in question, Afton's revenues from book sales and contract publishing were less than half of its costs. To make up the difference, Afton solicited donations from a variety of individuals and organizations. Some of these donations were designated for specific publishing projects and the Books–for–Schools program; others were made to cover Afton's general operating expenses.

Based on the record as a whole, and recognizing that property tax exemptions are to be strictly construed, the tax court concluded that Afton was not an institution of purely public charity exempt from real property taxation under Minn.Stat. § 272.02, subd. 7.

Because all property is presumed to be taxable, the taxpayer bears the burden of proving entitlement to an exemption. *Croixdale, Inc. v. County of Washington*, 726 N.W.2d 483, 487 (Minn.2007). Exemptions from property tax liability for institutions of purely public charity are to be strictly construed. *Am. Ass'n of Cereal Chemists v. County of Dakota*, 454 N.W.2d

912, 914 (Minn.1990). Nevertheless, as we observed in *Christian Business Men's Committee of Minneapolis v. State*, 228 Minn. 549, 559, 38 N.W.2d 803, 811 (1949):

Although it is a general rule that constitutional provisions exempting property from taxation are to be strictly construed, such provisions, though not subject to extension by construction or implication, are to be given a reasonable, natural, and practical interpretation in the light of modern conditions in order to effectuate the purpose for which the exemption is granted.

 We review tax court decisions to determine whether the court's decisions are supported by the evidence and in conformity with the law. *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 835 (Minn.2005). We will affirm the tax court "when, after an independent review of the record, there is sufficient evidence in the record upon which the tax court could have reasonably based its conclusion." *Care Inst., Inc.-Maplewood v. County of Ramsey*, 576 N.W.2d 734, 738 (Minn.1998). We review the tax court's legal determinations de novo. *Intergenerational Living and Health Care of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn.2005).

 The tax court analyzed this case using the six factors set out in our decision in *North Star*:

(1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part; (4) whether the income received from gifts and donations and charges to users produces a profit to the charitable institution; (5) whether the beneficiaries of the "charity" are re-

stricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

306 Minn. at 6, 236 N.W.2d at 757 (citations omitted). The tax court recognized that an entity that qualifies as an institution of purely public charity need not satisfy every *North Star* factor. *Mayo Found. v. Comm'r of Revenue*, 306 Minn. 25, 36, 236 N.W.2d 767, 773 (1975). Nevertheless, based on the record as a whole, the tax court found that Afton satisfied only *North Star* factors one, four, and six, and was not exempt from taxation as an institution of purely public charity. As we explain below, we conclude that the *North Star* analysis is not appropriate in this case because Afton used the property in question for both charitable and commercial purposes. We apply instead the test we used in *Christian Business Men's Committee*, which permits commercial use of otherwise exempt property so long as that commercial use is incidental to the charitable use. 228 Minn. at 561, 38 N.W.2d at 812. Because Afton's use of its real property for commercial purposes was incidental to its use for charitable purposes, we conclude that the property qualifies for exemption during the years in question.

 We first address the tax court's application of *North Star* in this case. The tax court applied the *North Star* factors to Afton based on the following language from our opinion in *Maplewood*: "Resolution of a given case under Minn.Stat. § 272.02, subd. 1(6), requires an analysis of the facts of that case in light of the North Star factors with each case being decided on its own merits." 576 N.W.2d at 738.

■ That language from *Maplewood*, however, must be understood in the context of that case. In that case, Maplewood, an assisted living facility, argued that it was entitled to an exemption from property taxes "because a nursing home was found to be exempt in *Assembly Homes,*[1] an assisted living complex was found to be exempt in *Inter–Faith,*[2] and because an organization related to it was found to be exempt by the tax court in *Care Institute, Inc.-Roseville.*"[3] 576 N.W.2d at 738. That is, Maplewood argued it was entitled to an exemption based not on its own merits but under the doctrine of stare decisis. *Id.* at 737. We rejected Maplewood's stare decisis argument with the observation that each case must be "decided on its own merits." *Id.* at 738. We did not intend to dictate the rigid application of the six *North Star* factors in every case. Indeed, doing so would have been contrary to our oft-repeated instructions that the *North Star* factors are only guides for analysis, *e.g., Mayo Found.,* 306 Minn. at 36, 236 N.W.2d at 773, and that each case must be decided on its own facts, *e.g., Chateau Cmty. Hous. Ass'n, Inc. v. County of Hennepin,* 452 N.W.2d 240, 243 (Minn.1990).

■ We therefore reiterate the comments we made in *Under the Rainbow*: if one or more of the *North Star* factors are not helpful in assessing whether an organization is an institution of purely public charity, those factors need not be analyzed, and if other analytical tools are more helpful than the *North Star* factors, they should be used instead. Slip op. at 8.

Although we reject the tax court's notion that the *North Star* factors *must* be applied to Afton, that does not answer the question of whether the *North Star* factors *should* be applied to Afton. The *North Star* factors were drawn from cases dealing with "organizations which were engaged in charitable undertakings in the traditional sense—care for the sick, the aged, and the infirm; education of young people, hospital care for the poor; facilities to promote the moral and educational welfare of youth; institutions for religious education." 306 Minn. at 5–6, 236 N.W.2d at 756–57. Our post-*North Star* decisions dealing with such entities as assisted living facilities,[4] low-income and student housing,[5] and health care[6] have all employed the *North Star* analysis. Arguably, each of these cases has involved, in the language of *North Star*, an entity "engaged in charitable undertakings in the traditional sense" and perhaps we therefore have not been confronted with a case in which the *North Star* approach is not useful.

But we did not apply the *North Star* factors to North Star itself, and therefore our understanding of when the *North Star* analysis may not be helpful should begin

---

1. Referring to *Assembly Homes, Inc. v. Yellow Medicine County,* 273 Minn. 197, 140 N.W.2d 336 (1966).

2. Referring to *Inter–Faith Social Services, Inc. v. County of Carlton,* 376 N.W.2d 687 (Minn. 1985).

3. Referring to *Care Institute, Inc.-Roseville v. County of Ramsey,* 612 N.W.2d 443 (Minn. 2000).

4. *Croixdale, Inc. v. County of Washington,* 726 N.W.2d 483 (Minn.2007); *Care Inst., Inc.-Maplewood Care Inst., Inc.-Roseville v. County of* Ramsey, 612 N.W.2d 443 (Minn.2000); *Community Memorial Home at Osakis, Minnesota, Inc. v. County of Douglas,* 573 N.W.2d 83 (Minn.1997).

5. *Worthington Dormitory, Inc. v. Comm'r of Revenue,* 292 N.W.2d 276 (Minn.1980); *Rio-Vista Non–Profit Hous. Corp. v. Ramsey County,* 277 N.W.2d 187 (Minn.1979).

6. *SHARE v. Comm'r of Revenue,* 363 N.W.2d 47 (Minn.1985).

there. North Star was a contract research organization that performed applied research for government agencies and private corporations on a cost-plus basis. 306 Minn. at 4, 236 N.W.2d at 756. Upon completion, the research work project became the property of the client requesting it. *Id.* We noted two "distinctive characteristics of North Star which make its situation so different from those of charities in the traditional sense that reference to" the *North Star* factors was "of limited value." *Id.* at 7, 236 N.W.2d at 757. First, we noted that a public benefit "is not the immediate objective of the undertaking." *Id.* at 8, 236 N.W.2d at 758. That is, North Star's

> concern is not to develop knowledge in the abstract, with possible indirect benefit to private enterprise, but instead to apply research tools to the particular problems of a particular business enterprise for the specific purpose of developing data or processes which can be turned into a profit for the beneficiary of the information.

*Id.* at 7, 236 N.W.2d at 757–58. We acknowledged that the public could benefit from the research conducted by North Star, but any such public benefit would be "indirect." *Id.* at 8, 236 N.W.2d at 758. In contrast, the public benefit from more traditional charitable activities is more tangible:

> Persons relieved from poverty and illness and the restraints of old age demand less of, and contribute more to, the economic well-being of a community than do those who are not so relieved. A person who receives the benefits of an education, whether theoretical or practical, may add more to the well-being of a society than one who is not so advantaged. It has been recognized that reli-

gious education and training add to the moral strength of a community.

*Id.* at 7, 236 N.W.2d at 757.

Second, we noted that "information developed as a result of [North Star's] research is not made available to the public generally or to industry generally," and therefore North Star's research did not have a "public purpose in a sense comparable to such purposes as the relief of poverty and sickness, the general dissemination of knowledge, and the encouragement of religion, science, and the arts." *Id.* at 8, 236 N.W.2d at 758. Indeed, we characterized this aspect of North Star's work as "the critical one." *Id.*

Here, we conclude that one of Afton's activities—its contract publishing work—is, like the contract research performed by North Star, "so different from those of charities in the traditional sense," *id.* at 7, 236 N.W.2d at 757, that reference to the *North Star* factors is of limited value in evaluating it. During the years at issue, Afton published several books under contract with particular organizations and individuals. The organization or individual paid Afton (or solicited others to make contributions to Afton) to publish the book and, significantly, upon completion all or virtually all of the copies of the book typically went to the contracting individual or organization.

Like North Star's contract research, Afton's contract publishing directly benefited only the entity who contracted for publication of the particular book; any public benefit was, in the words of *North Star,* "an indirect one and * * * not the immediate objective of the undertaking." *Id.* And, like North Star's contract research, the books published by Afton under contract typically were "not made available to the public generally." *Id.* As a result, Afton's contract publishing was neither a "public purpose" nor a charitable use of its

property. Rather, Afton's contract publishing must be viewed as a commercial activity. Because the *North Star* factors derive from cases involving traditionally charitable activities, their application to commercial activities is, as we indicated in *North Star*, of limited value. The tax court therefore erred as a matter of law in analyzing the status of Afton's real property using only the six *North Star* factors.

When in the past we have been faced with property used for both commercial and arguably charitable purposes, we have applied a test very different from *North Star*. In *Christian Business Men's Committee*, we considered the status of a multi-story building owned and used by a non-profit organization. 228 Minn. at 551, 38 N.W.2d at 807. The organization's use of its property was mixed. The first floor of the building was rented to commercial tenants, and we held that portion of the property was not exempt from property taxation. *Id.* at 555–58, 38 N.W.2d at 809–10. But the second and third floors of the building were used for meetings conducted by various clubs and societies, as a restaurant serving both staff and the general public, and as a drop-in child care center—in other words, for both commercial and charitable purposes. *Id.* at 552–53, 38 N.W.2d at 807–08.

We first concluded that the Christian Business Men's Committee itself qualified as an institution of purely public charity, noting that the organization was "a Christian laymen's organization dedicated to the unselfish purpose of teaching and exemplifying the gospel by precept and by a beneficent service extended to all members of the public without regard to race or creed." *Id.* at 554–55, 38 N.W.2d at 808. We then observed:

An institution of purely public charity enjoys tax exemption only with respect to property—and not with respect to the income therefrom—*presently, exclusively,* and *directly* applied to, and actually used in, the promotion of its charitable purposes; but *such property may in part, without loss of the tax-exemption privilege, be devoted to activities which of and by themselves are normally commercial,* such as the operation of a restaurant and similar services, *if such restaurant or other services are subordinate to, and are reasonably necessary in meeting a need integrated with, its purely charitable program*—such as providing reasonably satisfactory accommodations for the institution's personnel and charitable activities clientele—and such tax-exemption privilege is not lost although such food or other services are incidentally and without deliberate design made available to the general public.

*Id.* at 561, 38 N.W.2d at 812 (second emphasis added). We therefore held that the presence of the restaurant did not prevent the second and third floors of the property from qualifying for a tax exemption because the commercial food service was "incidental to petitioner's charitable activities and * * * reasonably necessary in the furtherance of its purely charitable program" and "has not been operated for the purpose of deriving a profit." *Id.* at 561, 38 N.W.2d at 812.

We applied the same approach in *Mayo Foundation*, apparently the only other case we have decided that presented both charitable and commercial use of the same property. We acknowledged that the Mayo entities were engaged in commercial activities, namely, the private practice of medicine. 306 Minn. at 38, 236 N.W.2d at 774. In fact, during the years at issue in that case, the income generated by the Mayo Clinic's private practice of medicine constituted "the principal source of income of the Mayo Foundation." *Id.* at 29, 236

N.W.2d at 769. But the Mayo entities also conducted extensive charitable work during the years at issue funded by revenues from the private practice of medicine, including operating the Mayo Graduate School of Medicine, *id.* at 28, 236 N.W.2d at 769, providing medical care regardless of the financial circumstances of the patient, *id.* at 30, 236 N.W.2d at 770, providing free medical care for patients at the Rochester State Hospital, *id.* at 30–31, 236 N.W.2d at 770, and providing free surgical treatment for patients at other state hospitals and state penal institutions, *id.* at 31, 236 N.W.2d at 770. We concluded that the Mayo entities were institutions of purely public charity, despite their commercial practice of medicine, because their commercial activities were "incidental to" and "inextricably interwoven with" their educational and research activities, *id.* at 38, 236 N.W.2d at 774, which we characterized as "charitable activities in the traditional and strict sense," *id.* at 36, 236 N.W.2d at 773.

 Therefore, when real property is used for both commercial and arguably charitable purposes, the commercial use of the property will not prevent the property from being exempt from property taxation as an institution of purely public charity if the commercial use is incidental to and reasonably necessary in furtherance of the entity's charitable activities.

██ Applying these principles, we first consider whether Afton's use of the property for other than contract publishing was charitable during the years at issue. We conclude that the tax court erred in concluding that it was not. As we held in *Under the Rainbow,* if an organization is to be deemed an institution of purely public charity, it must necessarily demonstrate that it provides a substantial proportion of its goods or services to recipients free of charge or at considerably less than either

market value or cost. Slip op. at 28. Here, the tax court found that Afton's Books–for–Schools program did not satisfy this test because Afton itself received payment for the donated books from another source. But the focus of the test is on the beneficiaries of the proposed charity and, as the tax court found, the schools and students who benefited from Afton's Books–for–Schools program received the books free of charge. When an organization provides goods or services free of charge, the organization will necessarily have received the means to provide those goods or services from "another source."

In this case, Afton solicited donations in order to fund a portion of the Books–for–Schools program. In some cases, the donor indicated a preference for the recipient of the donated materials; in other cases, the recipient was chosen by Afton. That a donor has earmarked or restricted its donation does not change the analysis of whether the beneficiaries of the charity receive goods or services free or at substantially reduced cost. The tax court therefore erred in not considering Afton's Books–for–Schools program in its evaluation of *North Star* factor three.

We also conclude the tax court erred in its finding with respect to Afton's sales of books to the general public. As the tax court found, Afton regularly sells its books to the general public at a fraction of their cost. Afton prices its books substantially below cost because doing so is an integral part of Afton's charitable purpose, thus its book sales satisfy the threshold test. Considering the proportion of Afton's books that are donated to schools free of charge and sold to the public at a loss, we conclude that Afton provides a substantial proportion of its goods free of charge or at considerably less than cost.

In addition, Afton's articles of incorporation limit its operation to charitable and

educational purposes. Its corporate mission statement similarly calls for it to provide books and curriculum packages free of charge to schools and public libraries. It did not earn a profit in any of the years at issue and its assets are not available to private interests upon dissolution. Afton is therefore an institution of purely public charity.

Finally, we consider whether Afton's commercial use of the property for contract publishing is, in the language of *Christian Business Men's Committee*, not "for the purpose of deriving a profit" and also "subordinate to, and * * * reasonably necessary in meeting a need integrated with, its purely charitable program." 228 Minn. at 561, 38 N.W.2d at 812 (emphasis omitted). Afton's contract book sales met this test during the tax years at issue. First, Afton's contract publishing was conducted for the purpose of contributing to payment of Afton's general overhead expenses, rather than to generate a profit for Afton as a whole. Considering that Afton's expenses generally exceeded its revenue, such contract publishing was reasonably necessary in attempting to meet Afton's general overhead expenses. Second, Afton's contract publishing was subordinate to its general trade publishing in terms of the number of books published in the years at issue.

The tax court therefore erred in denying Afton an exemption from payment of real property taxes assessed in 2003, 2004, and 2005. Because each tax year must be evaluated individually, our holding is limited to taxes assessed in those years.

Reversed.