**UNDER THE RAINBOW CHILD CARE CENTER, INC.,**
**Respondent,**

v.

**COUNTY OF GOODHUE, Relator.**

No. A07–468.

Supreme Court of Minnesota.

Dec. 6, 2007.

---

Stephen N. Betcher, Goodhue County Attorney, Carol K. Lee, Assistant Goodhue County Attorney, Red Wing MN, for Relator.

Daniel J. Biersdorf, Biersdorf & Associates, Minneapolis MN, and Jennifer Lappegaard, Watson & Speight, Red Wing MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

In this case, we review the final order of the Minnesota Tax Court exempting real property owned by respondent Under the Rainbow Child Care Center, Inc. (Rainbow), from payment of real property taxes assessed in 2004 and 2005. The tax court concluded that Rainbow's property qualified for tax exemption because Rainbow is an institution of purely public charity under Article X, Section 1 of the Minnesota Constitution and Minn.Stat. § 272.02, subd. 7 (2006), applying the six factors listed in *North Star Research Institute v. County of Hennepin*, 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975). On certiorari to this court, relator Goodhue County asserts that the evidence did not establish that Rainbow is an institution of purely public charity. We agree and reverse the tax court.

Rainbow is a state-licensed child care center in Red Wing, established as a sole proprietorship in 1994 by Michelle Finholdt, Rainbow's executive director. Rainbow was incorporated in 1995 as a nonprofit corporation under Minn.Stat. ch. 317A (2006). Rainbow's articles of incorporation state that Rainbow's mission is "to provide care [for] children away from their homes" and that Rainbow is "organized exclusively for charitable, scientific, literary, or educational purposes." Rainbow has not realized a profit during any year of its existence.

Tuition must be paid for each of the children enrolled in Rainbow. Rainbow based its child care rates on the average rates charged by other day care centers in Goodhue County. According to a comparison of rates charged by child care centers in Red Wing prepared by Goodhue County, Rainbow's 2006 weekly rates were higher than the two other child care centers in Red Wing for infants, toddlers, and preschool children. Rainbow's weekly rate was lower than that of one center but higher than the rate of the other center for school age children. The tax court found that Rainbow's tuition rates were "at or just below market rates."

Rainbow directed families who had difficulty paying tuition to Goodhue County Social Services, and Rainbow's clients included children whose families received child care assistance payments from Goodhue County, from Pierce County, Wisconsin, and from the Prairie Island Tribal Community. Families that received child care assistance from the counties or from the Prairie Island Tribal Community were charged the same tuition as families that did not receive assistance. Although Rainbow's executive director testified that Rainbow wrote off "several thousands of dollars in unclaimed childcare payments every year," Rainbow offered no scholarships and had in the past pursued collection efforts against families that did not pay.

The tax court found that all of the *North Star* factors were satisfied by Rainbow except the third factor. Based on this evaluation of the factors, the tax court concluded that Rainbow was entitled to exemption from property taxes assessed in

2004 and 2005 as an institution of purely public charity under Minn.Stat. § 272.02, subd. 7.

## I.

Rainbow claims it is exempt from payment of real property taxes as an institution of purely public charity. Article X, Section 1 of the Minnesota Constitution requires that "[t]axes shall be uniform upon the same class of subjects" but exempts from taxation "public burying grounds, public school houses, public hospitals, academies, colleges, universities, all seminaries of learning, all churches, church property, houses of worship, *institutions of purely public charity*, and public property used exclusively for any public purpose." (Emphasis added.) Minnesota Statutes § 272.02, subd. 7, echoes this provision, exempting from taxation "[i]nstitutions of purely public charity."

■■■ Because tax exemptions are "an exception in derogation of equal rights," all property is presumed to be taxable, and the taxpayer bears the burden of proving entitlement to an exemption. *Camping & Educ. Found. v. State*, 282 Minn. 245, 250, 164 N.W.2d 369, 372 (1969); *see also Croixdale, Inc. v. County of Washington*, 726 N.W.2d 483, 487 (Minn.2007). Furthermore, exemptions from property tax liability must be strictly construed. *E.g., Camping & Educ. Found.*, 282 Minn. at 250, 164 N.W.2d at 372. We have also observed:

> As the burdens of government should be borne by all the citizens in equal proportions, no property should be exempt from taxation in the absence of clear and explicit legislation authorizing the same, and in the construction of a law exempting property from taxation, courts will indulge no presumption that will extend the exemption beyond the plain requirements of the law itself.

*St. Peter's Church, Shakopee v. Bd. of County Comm'rs*, 12 Minn. 395, 397–98 (Gil. 280, 282) (1867). We must therefore construe the purely public charity exemption narrowly and take care to avoid extending the exemption under Minn.Stat. § 272.02, subd. 7, "beyond the plain requirements of the law itself."

■■■ "We may review any final order of the tax court on the ground that the tax court lacked jurisdiction or committed an error of law or that its order was not justified by the evidence or in conformity with the law." *Manpower, Inc. v. Comm'r of Revenue*, 724 N.W.2d 526, 528 (Minn. 2006) (citing Minn.Stat. § 271.10, subd. 1 (2006)). We "will affirm the tax court when, after an independent review of the record, there is sufficient evidence in the record upon which the tax court could have reasonably based its conclusion." *Care Inst., Inc.-Maplewood v. County of Ramsey*, 576 N.W.2d 734, 738 (Minn.1998). As a result, we give great deference to the tax court's determination whether an organization qualifies as a purely public charity, so long as that determination is reasonably supported by the evidence. *Id.* We review the tax court's legal conclusions de novo. *Nw. Racquet Swim & Health Clubs, Inc. v. County of Dakota*, 557 N.W.2d 582, 586 (Minn.1997).

In this case, the tax court analyzed the six factors listed in our decision in *North Star*:

> (1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part; (4) whether the income received from gift and donations and charges to users produces a profit to the

charitable institution; (5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

*N. Star*, 306 Minn. at 6, 236 N.W.2d at 757. The tax court found that Rainbow satisfied all of the factors except factor three and concluded that Rainbow qualified as an institution of purely public charity. As we will explain, we conclude that an entity cannot be an institution of purely public charity without satisfying *North Star* factor three, and therefore we reverse.

■ But first we add a note of caution against overly rigid reliance on the six *North Star* factors. Due in no small part to our own opinions, the *North Star* factors have come to be viewed as a multi-part test to be used in determining whether an organization is an institution of purely public charity. But we did not identify the six factors in *North Star* as the parts of a multi-faceted test. Rather, we simply explained that these were some of the factors we had assessed in previous cases when evaluating "organizations which were engaged in charitable undertakings in the traditional sense." *N. Star*, 306 Minn. at 5–6, 236 N.W.2d at 756–57. And, as pointed out recently by Justice Hanson, we did not indicate in listing the factors in *North Star* that they had all been used in combination in any of those previous cases. *Croixdale*, 726 N.W.2d at 492 (Hanson, J., concurring). Significantly, we found the six factors unhelpful in *North Star* itself, explaining that "[t]here are distinctive characteristics of North Star which make its situation so different from those of charities in the traditional sense that refer-

ence to general statements made in our previous cases are of limited value." *N. Star*, 306 Minn. at 7, 236 N.W.2d at 757. Thus, it should be apparent that *North Star* did not establish six mandatory elements that must be considered and satisfied in every charitable exemption case.

We explained the appropriate approach to the *North Star* factors in a contemporaneous case, *Mayo Foundation v. Commissioner of Revenue*, 306 Minn. 25, 236 N.W.2d 767 (1975). In *Mayo Foundation*, the Commissioner argued that our prior cases established seven prerequisites for granting tax exempt status as a charitable institution. *Id.* at 35–36, 236 N.W.2d at 772–73. We rejected the Commissioner's rigid approach, explaining:

The factors identified by the commissioner are comparable to those set forth in the North Star Research case, and we agree that they are appropriate for the consideration of charitable status. However, the significant difference between the approach advocated by the commissioner and the one which we adopt lies in our view of the weight to be given to the individual factors. *The general language of our definitional statements and the identification of factors in our prior cases are only guides for analysis.* Each case must be decided on its own particular facts and it is not essential that every factor mentioned in our decisions be present before an institution qualifies for exemption.

*Id.* at 36, 236 N.W.2d at 773 (emphasis added). We have reiterated in subsequent cases the methodology described in *Mayo Foundation:* that the *North Star* factors are intended to serve only as guidelines, *e.g., Cmty. Mem'l Home at Osakis, Minn., Inc. v. County of Douglas*, 573 N.W.2d 83, 86 (Minn.1997); that not all factors must be satisfied to qualify for the exemption, *e.g., Croixdale*, 726 N.W.2d at 488; and

that each case must be decided on its own facts, *e.g., Chateau Cmty. Hous. Ass'n v. County of Hennepin,* 452 N.W.2d 240, 242 (Minn.1990).

Nevertheless, we have referred to all six *North Star* factors in virtually every subsequent case in which the charitable exemption was at issue, and we have recently described the factors as a "six-factor test," *Croixdale,* 726 N.W.2d at 488. As a result, we may have created the impression that all six factors must be examined in every case addressing the charitable exemption issue. But as *North Star* itself illustrates, that is not true. In the circumstances of a particular case, one or more of the *North Star* factors may not be helpful in assessing whether an organization is an institution of purely public charity, and if that is true, those factors need not be analyzed. And if other analytical tools are more helpful in identifying whether an organization is an institution of purely public charity, those tools should be utilized.

The other side of this coin is that although we have often stated that not all of the *North Star* factors must be satisfied in order to qualify for the exemption, some of the factors are, indeed, essential. For example, regardless of the status of the other factors, we cannot envision an organization qualifying as an institution of purely public charity if it makes available to private interests either dividends, in form or substance, or assets upon dissolution, and thus fails to satisfy *North Star* factor six. *N. Star,* 306 Minn. at 6, 236 N.W.2d at 757. Here, the tax court found that Rainbow satisfied all the *North Star* factors except factor three, which examines the extent to which "the recipients of the 'charity' are required to pay for the assistance received in whole or in part." *Id.* at 6, 236 N.W.2d at 757. Relying on our statements that not every factor must be satisfied, the tax court concluded that even though factor three was not satisfied, Rainbow qualified as an institution of purely public charity.

Despite our statements that not all the *North Star* factors must be satisfied in order to qualify for the exemption, in applying those factors we have never found an organization that did not satisfy factor three to be an institution of purely public charity. The factor three inquiry, the extent to which the recipients of the charity are required to pay for the assistance received, tests for a value that is fundamental to the concept of charity—that is, whether the organization *gives* anything away. Because this is a core characteristic of an institution of public charity, we now clarify that the third factor must be satisfied if an organization is to be deemed an institution of purely public charity.

We must not lose sight of the fact that both the constitutional provision and the statute that we are applying authorize a tax exemption for institutions of purely public *charity.* Minn. Const. art. X, § 1; Minn.Stat. § 272.02, subd. 7. Although we have not developed a precise and all-encompassing definition of the term "charity," we have frequently relied on the following description, which, significantly, defines charity as a gift:

> The legal meaning of the word "charity" has a broader significance than in common speech and has been expanded in numerous decisions. Charity is broadly defined as a *gift,* to be applied consistently with existing laws, for the benefit of an indefinite number of persons by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.

*Junior Achievement of Greater Minneapolis, Inc. v. State,* 271 Minn. 385, 390, 135 N.W.2d 881, 885 (1965) (emphasis added) (internal quotation marks omitted). We explained further in *Junior Achievement* that not even every gift with a beneficent purpose necessarily qualifies as charity for these purposes: "it is not safe to say as a universal rule that any *gift* which tends to promote man's well-being is a charity." *Id.* at 390, 135 N.W.2d at 885 (emphasis added). We then quoted a Massachusetts decision that explained:

> It has come to be recognized that new objects must be added in order to comprehend within the class of charities a wide variety of *gifts* which represent a wholly generous and unselfish devotion of wealth to uses which benefit the public generally or whole classes of the public and from which the donor derives no personal advantage.

*Id.* at 391, 135 N.W.2d at 885 (emphasis added) (quoting *Boston Chamber of Commerce v. Assessors of Boston,* 315 Mass. 712, 54 N.E.2d 199, 202 (1944)). Although each of these statements addressed the breadth of purposes that a charity may serve, the common thread was another element—one that is inherent in the common understanding of charity: that charity is a gift. Absent the element of a gift, we fail to see how an endeavor can be fairly characterized as a charity.

By examining the extent to which "the recipients of the 'charity' are required to pay for the assistance received in whole or in part," factor three assesses whether the organization's operation confers a gift. *N. Star,* 306 Minn. at 6, 236 N.W.2d at 757. Therefore, if factor three is not satisfied, the organization cannot be found to be an institution of public charity. *See SHARE v. Comm'r of Revenue,* 363 N.W.2d 47, 52 (Minn.1985) (although discussing other *North Star* factors, stating that "SHARE's

charitable exemption claim is defeated by application of factor three" because "SHARE provides no service without a fee").

Because the constitutional provision and the statute at issue here limit the exemption to institutions of purely public *charity,* it is not sufficient that an organization serves a worthwhile purpose, or even that it does so on a nonprofit basis. For example, in *SHARE* the organization's purpose was to "improve the availability and accessibility of quality of health care and health services," and it operated on a nonprofit basis, satisfying *North Star* factors one, four, and six. *Id.* at 51. We held that satisfaction of those three factors "does not itself qualify an institution as a 'purely public charity.'" *Id.*

This point illuminates the fundamental difference between our analysis and that of the dissent. The dissent believes that "the essence of a charity lies in the nature of the service provided" and therefore, "the question of whether an organization is a charity depends primarily on the nature of the service it provides." In contrast, we understand the essence of charity, as defined in our cases, to be the provision of the service as a gift to the recipient. The dissent instead sees the extent to which the recipients are charged for the service simply as a matter of the mechanism for funding the service, which "has limited materiality to the question of whether the organization is a charity." This primary emphasis on purpose and the concomitant marginalization of the gift factor allow the dissent to conclude that Rainbow could be deemed a purely public charity based simply on finding that (a) Rainbow's objectives "qualify as traditionally charitable," (b) it is "organized so that no individual can profit from ownership of its assets," and (c) it does not offer its services only to "a

select and favored few." [1]  This analysis would, in essence, hold that serving a worthwhile purpose and operating on a nonprofit basis is sufficient to exempt an organization from taxation as a "purely public charity." This interpretation of charity would expand the tax exemption far too broadly, for several reasons.

First, this expansive view of charity is contrary to the vast majority of our cases applying the exemption. The dissent relies on a passage in *North Star* in which we stated:

> The tendency of our decisions has been to sustain exemption where these traditionally "charitable" objectives are being furthered, so long as no individual profits from ownership of the "charity" are realized and so long as the undertaking is not a subterfuge by which the needs of a select and favored few are accommodated.

306 Minn. at 6, 236 N.W.2d at 757. Although this language does, indeed, suggest reference to charitable "objectives" and lack of individual profits as bases for applying the exemption, the dissent extracts too much from this lone passage that is, because we did not rely on it in deciding *North Star*, only dicta. Limiting the inquiry to an entity's objectives and the nonprofit nature of its operations is not supported by the cases on which the passage presumably relies. No case is cited directly in support of the passage, either in *North Star* or by the dissent in this case.

In *North Star*, the passage followed immediately the recitation of the six *North Star* factors, which in turn followed a listing of several "charitable undertakings in the traditional sense" and citations to cases in which they had been addressed. *Id.* at 5–6 & nn. 4–8, 236 N.W.2d at 756–57 & nn. 4–8. Of the five cases cited, only one could be said to lack the element of a charitable *gift*. See *Assembly Homes, Inc. v. Yellow Medicine County*, 273 Minn. 197, 140 N.W.2d 336 (1966), discussed below. Moreover, in numerous cases since *North Star* we have declined to exempt from taxation as purely public charities organizations that merely had traditionally charitable objectives and operated without profit to any individuals. See, for example, *SHARE*, 363 N.W.2d at 53 ("Although providing low cost health care on a non-profit basis is certainly worth encouraging, we are unable to conclude that it satisfies the requirements of that narrow charitable exemption."), and cases discussed below. [2]

Beyond its incompatibility with the actual rulings in our cases applying the charitable tax exemption, the dissent's broad interpretation of charity is contrary to the principle that tax exemptions must be construed narrowly. See, e.g., *Camping & Educ. Found.*, 282 Minn. at 250, 164 N.W.2d at 372. Far from being narrow, this interpretation of charity would have expansive consequences in two obvious respects. First, any enterprise that serves a beneficial purpose and operates on a non-

1.  Although the dissent explains that the tax court found Rainbow also satisfies the other *North Star* factors, except factor three, and would affirm on that basis, the dissent states that the analysis could end with the findings described in the text and "tax exemption should be recognized."

2.  The dissent states that the six-factor *North Star* test was developed "to provide guidance in determining whether activities that were not traditionally viewed as being charitable

could nevertheless qualify as charitable," perhaps implying that the alternative "objectives plus nonprofit" test is therefore the test appropriate for traditional charities. But as explained above, the six factors were listed in *North Star* as factors assessed in cases of *traditional* charities, and the court went on to conclude that the factors were inapplicable to the task of evaluating a non-traditional entity such as North Star.

profit basis would enjoy exemption from property taxes as a purely public charity. Indeed, the dissent's view would grant exemption from payment of property taxes to virtually any organization exempt from payment of federal income taxes under I.R.C. § 501(c)(3) (2000).[3] If the legislature had intended all organizations exempt from payment of federal income taxes under I.R.C. § 501(c)(3) also to be exempt from payment of real property taxes, it could have so provided, as it did with regard to state income taxation. *See* Minn.Stat. § 290.05, subd. 2 (2006) (providing exemption from state income and franchise taxes for organizations exempt from federal income taxation under Subchapter F of the Internal Revenue Code, which includes section 501(c)(3)). That it has not done so indicates that, in the legislature's view, there is a difference between an entity that qualifies for exemption from payment of federal income taxes because it does good works and from which its owners do not personally benefit, and an entity that qualifies for exemption from payment of property taxes as an institution of purely public charity. We have never treated an organization's tax-exempt status for federal income tax purposes as determinative of our inquiry. *See, e.g., SHARE,* 363 N.W.2d at 50 (determinations of tax exemption for purposes of federal and state income taxation "are not controlling on the issue"); *Rio Vista Non-Profit Hous. Corp. v. County of Ramsey,* 277 N.W.2d 187, 189 (Minn.1979).

The second broad consequence of the dissent's interpretation of charity would be that a "charitable" enterprise could charge the same for its services as a for-profit competitor and nevertheless enjoy exemp-

tion from property taxation, as long as no profits inured to the benefit of members of the organization. This result flies in the face of our observation that *North Star* factor three "is intended to assess whether people will benefit from the organization's activities to an extent greater than if the organization were merely providing a service as part of the private market." *Skyline Pres. Found. v. County of Polk,* 621 N.W.2d 727, 733 (Minn.2001).

The legislature and governor, not this court, should make the policy judgments that determine the scope of tax exemptions. *See State v. N. Star Research & Dev. Inst.,* 294 Minn. 56, 80, 200 N.W.2d 410, 425 (1972) ("We unhesitatingly concede that the legislature, rather than this court, should determine the policy of this state with regard to the exemption, if any, from taxes that corporations such as North Star should be given."). The dissent criticizes our focus on requiring a gift in order to find that an organization provides charity as diluting the goal of tax exemption. In the dissent's view, "[t]hat goal is to encourage charitable services because, as we observed in *North Star,* 'people will benefit in an economic sense from [a] charitable undertaking.'" We note that people benefit most from a charitable undertaking when they are not required to pay full value for the benefit received. Moreover, in our view the goal of the purely public charity exemption is to encourage and make more economically viable precisely the form of charity that confers benefit without demanding full payment. The legislature may, of course, choose to encourage other forms of economically or otherwise publicly beneficial

---

3. Section 501(c)(3) exempts from payment of income taxes those entities "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition * * *, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

endeavors by providing various forms of tax incentives, and it has done so. *See, e.g.,* Minn.Stat. § 272.02, subd. 13 (2006) (exempting from property taxation property used to provide emergency shelter for victims of domestic violence). But merely because an endeavor provides economic or other social benefit does not make it a charity. And, once again, those tax policy choices are appropriately left to the political branches.

It is, thus, inherent in the concept of charity that there is a gift—that is, the services, goods, or whatever is conceived as the charitable benefit must be provided to the recipients of the charity without requiring them to pay full value for it.[4] Nevertheless, the expanded legal definition of charity that has evolved in the context of tax exemptions does not require that the charitable benefit be provided to all recipients entirely free of charge. Therefore, the third *North Star* factor has been refined to require that the charity be provided "free of charge, *or at considerably reduced rates.*" *Cmty. Mem'l Home,* 573 N.W.2d at 87 (emphasis added). And the "considerably reduced rates" requirement has been described as meaning "considerably less than market value or cost." *Id.*

Utilizing this standard, we held in *Rio Vista* that a private nonprofit entity providing housing to moderate and low income people was an institution of purely public charity entitled to the exemption. 277 N.W.2d 187, 192 (Minn.1979). In *Rio Vista,* the corporation offered two rent levels, a basic level and a higher fair market level, but almost all of the tenants paid the basic rent and none was wealthy enough to pay the fair market rent. *Id.* at 188. Similarly, in *Worthington Dormitory, Inc. v. Commissioner of Revenue,* a community-based nonprofit organization provided rental housing for students at the local community college. 292 N.W.2d 276, 278 (Minn.1980). This court reversed the ruling of the tax court that the organization was not a purely public charity for tax exemption purposes. *Id.* at 277. The court concluded that the students paid less than cost for the housing they received and that it was "doubtful" that the students paid "market rents," because they

4. The position we take here is not unique. For example, the Pennsylvania Supreme Court limited the definition of purely public charity to an entity that, among other things, "[d]onates or renders gratuitously a substantial portion of its services." *Hosp. Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306, 1317 (1985). The Pennsylvania legislature subsequently incorporated this requirement into one of the statutory criteria for an institution of purely public charity. 10 Pa. Cons.Stat. Ann. § 375(d)(1) (2007). The Oregon Supreme Court similarly held that one of the required elements of a charitable institution exempt from payment of property taxes is that "the organization's performance must involve a gift or giving." *Sw. Or. Pub. Defender Servs., Inc. v. Dep't of Revenue,* 312 Or. 82, 817 P.2d 1292, 1296 (1991). In *Utah County v. Intermountain Health Care, Inc.,* the Utah Supreme Court observed that an entity was exempt from property taxes "only if it meets the definition of a 'charity' or if its property is used exclusively for 'charitable' purposes." 709 P.2d 265, 269 (Utah 1985). An "essential element of charity is an *act of giving.*" *Id.* The Utah court then adopted the following identifying features of a "gift": "either * * * a substantial imbalance in the exchange between the charity and the recipient of its services or * * * the lessening of a government burden through the charity's operation." *Id.* The Illinois Supreme Court similarly required that an entity exempt from payment of property taxes as a charitable institution, among other requirements, "dispense[ ] charity to all who need and apply for it, * * * not provide gain or profit in a private sense to any person connected with it, and * * * not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses." *Methodist Old Peoples Home v. Korzen,* 39 Ill.2d 149, 233 N.E.2d 537, 542 (1968).

paid substantially less than the charges at comparable state-operated dormitory facilities. *Id.* at 281.

While granting the exemption to organizations that charged considerably less than market prices, we have consistently denied the exemption from property taxes to entities that charged recipients of their "charity" substantially market rates, even where some fees were discounted or forgiven. In *Chateau Community Housing*, the organization seeking the charitable exemption provided student and faculty housing on a nonprofit basis. 452 N.W.2d 240, 243 (Minn.1990). We found that Chateau provided no scholarships or rent assistance to needy students, that students were evicted for nonpayment of rent, and that in contrast to the discounted rental rates in *Rio Vista* and *Worthington*, Chateau charged rents comparable to private housing and considerably higher than university-owned housing. 452 N.W.2d at 243–44. As a result, we affirmed denial of the purely public charity exemption. *Id.* at 244.

Similarly, in *SHARE*, we affirmed denial of the purely public charity exemption to a health maintenance organization. 363 N.W.2d 47, 48 (Minn.1985). The HMO, SHARE, provided no services without a fee, except for a one-time short-term project, and had no policy to provide substantial discounts to those for whom cost of treatment would be an unreasonable burden. *Id.* at 52. Rather, HMO membership would be discontinued if an individual could not pay the full monthly fee. *Id.* In addition to assessing the other *North Star* factors, we declared that "SHARE's charitable exemption claim is defeated by application of factor three—whether recipients of the charity are required to pay for the assistance in whole or in part." *Id.* The fact that some of the HMO members were participants in Medicare whose fees were largely paid by that federal program did not change our assessment. *Id.* at 49, 52–53.

In *Chisago Health Services v. Commissioner of Revenue*, we affirmed the tax court's rejection of the purely public charity exemption for a health clinic that furnished outpatient services at market level fees. 462 N.W.2d 386, 387 (Minn.1990). We explained that the clinic claimed to have an open door policy, but all patients were billed for medical services, and the clinic simply wrote off the bills as uncollectible if a patient was unable to pay. *Id.* at 388. The clinic accepted payment at reduced rates from Medicare and Medicaid, but we declined to view the discounted payments as an extension of charity to the patients by the clinic. *Id.* at 388, 391. Rather, we agreed with the tax court's ruling that there was no difference between those Medicare and Medicaid discounts and the business discounts negotiated by HMOs and health insurers with other public and private clinics and hospitals. *Id.* at 391. Likewise, we endorsed the tax court's conclusion that writing off a small number of uncollectible accounts was not charity but merely a business practice similar to that of other health care providers. *Id.*

*Community Memorial Home* was another case in which we affirmed the tax court's denial of the purely public charity exemption for an organization that charged essentially market rates. 573 N.W.2d 83, 85, 87 (Minn.1997). *Community Memorial Home* involved an assisted living facility that attempted to satisfy factor three by showing that it lost money each year. *Id.* at 87. We rejected that argument, pointing out that the losses could be caused by numerous factors. *Id.* The facility also relied on the fact that it accepted grant payments from the county for some residents at less than full rent, but we remarked that the facility had not

shown that "acceptance of referrals from Douglas County is anything more than a business decision to fill empty rental units." *Id.* at 88. We concluded that "[t]he record is devoid of evidence demonstrating that [the organization's] intended purpose is to provide housing and services for the economically disadvantaged or that it will continue to do so in the future." *Id.*

In summary, these cases establish that to qualify for the exemption from property taxes as an institution of purely public charity an organization must provide its "charity" to recipients free of charge or at considerably reduced rates. Moreover, it is not sufficient to provide free or reduced-rate goods or services on such a small scale that they are merely an incidental part of the organization's operations. Nor will free or reduced-rate goods or services that are provided primarily for business purposes be adequate. The organization must demonstrate that its intended purpose is to provide a substantial proportion of its goods or services on a charitable basis. If the organization does not operate on these terms, it is indeed not an institution of purely public charity and cannot qualify for tax exemption on that basis.

We now apply these principles to the case at hand. The tax court found that Rainbow did not satisfy factor three, and we agree. We differ with the tax court in two respects, however. First, the tax court's finding that Rainbow's tuition was "at or just below market rates" is not supported by the evidence. Second, and more importantly, because we hold, for the reasons discussed above, that satisfaction of the third *North Star* factor is essential to qualify as a purely public charity, the tax court's conclusion that Rainbow qualified as an institution of purely public charity despite failing to satisfy factor three is an error of law.

We first address the tax court's factual finding that Rainbow's tuition was "at or just below market rates." The memorandum accompanying the tax court's findings of fact and conclusions of law lists child care rates that the court characterizes as "representative of the child care rates in Goodhue County as of July 1, 2006." It was against these "representative" rates that the court compared Rainbow's rates and concluded that Rainbow's rates were "at or just below market rates." But these "representative" rates come from an exhibit introduced by the county that in fact lists the *maximum* child care rates that Goodhue County is authorized to pay.[5] Rainbow's child care rates are indeed generally less than the county's maximum authorized rates.[6] But there is no evidence that the maximum authorized rates are actual market rates.[7]

5. Minnesota Statutes § 119B.09, subd. 1 (2006), requires the state to make child care services available "to families who need child care to find or keep employment or to obtain the training or education necessary to find employment" and who qualify financially. Minnesota Statutes § 119B.13, subd. 1(e) (2006), authorizes the Commissioner of Human Services to set out on a county-by-county basis the maximum rates that may be paid for child care from program funds. Under section 119B.13, subds. 1(e) and (f), the county pays the child care provider's full charges up to the maximum; the parent is responsible for payment of the provider's charges in excess of the maximum the county will pay.

6. For example, Goodhue County's maximum daily rate in 2006 for full-day infant child care was $49.82, but Rainbow's rate was $34.00. Similarly, Goodhue County's maximum rate in 2006 for weekly toddler child care was $151.58, but Rainbow's rate was $127.00.

7. The dissent concludes that the county's maximum authorized rates "are actually below market rates" because "[w]hen Rainbow commenced operations at the subject property in 2003," the maximum rates had been

A different exhibit lists the actual rates charged by child care centers in Red Wing in 2006. According to that exhibit, Rainbow's 2006 weekly rates were generally higher than the rates of the other Red Wing child care centers. Rainbow's weekly rates were higher than both of the other child care centers in Red Wing for infants, toddlers, and preschool children, who constituted 55 of Rainbow's 70–child licensed capacity. For school age children, Rainbow's weekly rates were lower than those of one center, but higher than those of the other. But school age children occupied only 15 of Rainbow's 70 licensed spots. Thus, when Rainbow's rates are compared to actual market rates, the tax court's finding that Rainbow's rates were "at or just below market rates" during the years in question is not supported by the evidence. Rather, Rainbow's weekly rates were for the most part above market rates.

■ The dissent questions whether there is sufficient evidence in this case to establish the "market" for child care services in Red Wing. But the burden fell squarely on Rainbow, as the entity seeking the exemption, to prove that its rates were substantially less than either market or cost and therefore the burden fell squarely on Rainbow to provide evidence of the "market" against which its rates should be compared. The evidence Rainbow offered

of market rates for child care were its own and those of the two other child care centers located in Red Wing. Rainbow's executive director testified that Rainbow sets its child care rates "[s]o we are running average with everybody else in the area."

The dissent argues that the only "true 'market rates' are those that would be charged by a for-profit corporation" and, because there were no for-profit child care centers in Red Wing County, "there is no evidence of a true market rate." Noting that the other two child care centers in Red Wing are, like Rainbow, nonprofit organizations, the dissent raises what could be legitimate questions in the proper case about measuring against the "market" if the "market" comprised entirely charitable enterprises. But even assuming a more appropriate market rate would be that charged by for-profit entities, the evidence presented by Rainbow as to the "market" shows that it comprises three nonprofit entities, of which Rainbow's weekly rates are generally the highest.[8] Rainbow met its burden to show what the market rates were by comparing its rates to its competitors, but did not meet its burden to show its rates were substantially below those market rates.

The dissent further posits that, regardless of whether Rainbow's child care rates are less than market rates, Rainbow still

frozen by legislative action at 2002 levels. Rainbow provided no evidence and there is none in the record of the relationship between the county's maximum rates and actual rates charged other than the evidence concerning the other two child care centers in Red Wing. There is, then, no basis in the record from which the dissent's conclusion can be drawn. Regardless of how the county's maximum authorized rates were set, the record is clear that rates at the three competing child care centers in Red Wing were significantly less than the county's maximum authorized rates across all categories of care. Again, compared to the only market of which there is any evidence in this record, the county's maxi-

mum authorized rates are not below market rates.

8. The dissent suggests that comparison to other providers' rates should take into account differing cost levels. For example, noting that Rainbow is larger than its two competitors, the dissent concludes, "[a]s a result, one would expect that Rainbow would have greater space and staff needs, with correspondingly greater insurance costs." But Rainbow introduced no evidence of greater space or staff needs or the presumed associated greater costs.

satisfies *North Star* factor three because its child care rates are less than its costs. The dissent opines that "[t]here is no dispute that Rainbow's rates are below cost, because it has operated at a loss in every year of its existence." But we have rejected a bright line test that would equate simply operating at a loss with operating a charity. We held that the fact that an entity operates at a loss is not sufficient to satisfy the third *North Star* factor, *Community Memorial Home*, 573 N.W.2d at 87, because revenues may not cover costs for a variety of reasons, "not necessarily because the facility intends to charge a below-cost rent." *Care Inst., Inc.-Roseville v. County of Ramsey*, 612 N.W.2d 443, 449 (Minn.2000). There is no evidence in this record that Rainbow deliberately charged below-cost rates during the years at issue. Indeed, the record before us—consisting of little more than Rainbow's federal tax information returns—is not sufficient to support any conclusions as to why Rainbow operates at a loss.

Further, even if we were to accept that Rainbow's rates are below cost, precedent requires Rainbow's rates to be "considerably less" than cost "as a means of proving that [rates] were established for the stated charitable purpose rather than for purely business reasons." *Croixdale*, 726 N.W.2d

at 488. The dissent presents a comparison of Rainbow's revenues and operating expenses in an effort to demonstrate that Rainbow's rates are "sufficiently below cost to meet the factor three test," but the dissent's comparison is flawed. For Rainbow's "operating expenses," the dissent relies on "total expenses" reported by Rainbow on its federal tax information returns for the years at issue. Indeed, that is the only evidence of expenses in the record before us. But for Rainbow's "revenues from rates," the dissent relies on a schedule prepared by Rainbow for the purpose of arguing that it received substantial contributions (in the form of government payments, gifts, and volunteer labor) in the years in question as a percentage of "total enrollment billed." There was no testimony at trial as to how "total enrollment billed" was calculated or what it includes or excludes. We think a more appropriate comparison for this purpose is between Rainbow's "total expenses," as reported on its federal tax information returns, and "program service revenue," as reported on those same federal tax information returns. That comparison shows that Rainbow's rates were not significantly less than cost in the years at issue—and, in fact, were in one instance more than cost:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Program Service Revenue | $415,627 | $488,457 | $513,821 |
| Total Expenses | $430,390 | $480,930 | $525,211 |
| Excess (Deficit) for the Year | ($14,763) | $7,527 | ($11,390) |
| Excess (Deficit) as a Percentage of Program Service Revenue | (3.55%) | 1.54% | (2.29%) |

These results are consistent with an organization that is a nonprofit under both Minn.Stat. ch. 317A and I.R.C. § 501(c)(3), but not with an organization that is "so organized and operated that its commercial activities are subordinate to or

incidental to any possible charitable activities." *Mayo Found.*, 306 Minn. at 36, 236 N.W.2d at 773.

■ Turning to the larger issue of whether Rainbow qualifies as an institution

of purely public charity, the case before us fits the pattern of the cases in which the exemption has been denied, especially the *Chisago Health Services* and *Community Memorial Home* cases. Rainbow sets its rates at or above market level and charges all the recipients of its services at those rates. Rainbow makes no accommodations for those who are unable to pay the full rates. The tax court found that Rainbow "offers no scholarships" and "retains the right to dismiss a child in the event that families are unable to afford fee payments," findings that Rainbow does not challenge.[9] It is clear that, as the tax court correctly concluded, Rainbow does not satisfy the third *North Star* factor. It is equally clear that Rainbow does not provide any services on a charitable basis and cannot therefore qualify as an institution of purely public charity.

Rainbow's acceptance of government payments for some of its clients does not change this conclusion. It is true that more than 20% of the fees received by Rainbow are paid by county or tribal governments for families that cannot afford to pay the full rates themselves. But our cases make it clear that the receipt of government payment of fees on behalf of some of the client families does not transform Rainbow's fee-for-services operation into a charity. In Community Memorial Home and Chisago Health Services, we did not consider even the acceptance of *discounted* rates paid for participants in government programs as evidence of a charitable endeavor. *Cmty. Mem'l Home*, 573 N.W.2d at 87; *Chisago Health Servs.*, 462 N.W.2d at 391. Rather, in *Community Memorial Home* we looked to the purpose of the organization and found no evidence of overall intent to serve the disadvantaged on a charitable basis. *Cmty. Mem'l Home*, 573 N.W.2d at 88; see also *Chisago Health Servs.*, 462 N.W.2d at 391–92.[10]

Here, the same is true of Rainbow. Although Rainbow accepted government payments, it offered no discount for participants in the government programs. Therefore, this did not represent charity provided by Rainbow to these families, because Rainbow was fully compensated for the services it provided. As in *Community Memorial Home*, there is no evidence that Rainbow's intended purpose was to provide day care to the economically disadvantaged; rather, Rainbow's purpose was to provide day care to those who could pay, either on their own or through government subsidy.

We are aware of only one case—*Assembly Homes*—in which the purely public charity exemption was granted to an organization that charged a market rate fee to all and some of those fees were paid by

9. The dissent cites testimony of Rainbow's executive director that Rainbow provided services to some children for no or lower fees and wrote off "several thousands of dollars in unclaimed child care payments every year." Without further explanation or evidentiary support, which is entirely absent, there is no way to know the actual circumstances of those write-offs. The write-offs could be based merely on uncollectible billings, which this court refused to consider as charity in *Chisago Health Services*, 462 N.W.2d at 391. Moreover, even if the write-offs represented lowered rates for low income families, "several thousands of dollars" is hardly indicative of a purpose to provide services on a charitable basis when compared to Rainbow's annual program services revenues in excess of $400,000.

10. In contrast, in *Rio Vista*, where government rent subsidies for some families appear to have been considered by the court in making its determination, the overall purpose of the corporation was to provide housing to people of low to moderate means, and the overall rental rate structure was well below market value. 277 N.W.2d at 188, 191–92.

government programs. 273 Minn. 197, 140 N.W.2d 336 (1966). In *Assembly Homes* we held a nursing home was exempt from property taxation as a purely public charity, even though we found that its rates, which were paid for some patients by county welfare boards and the U.S. Veterans Administration, were "similar to the rates charged generally in the State of Minnesota by nursing homes." *Id.* at 201, 204, 140 N.W.2d at 339, 341. The case predated *North Star,* so there was no discussion of the *North Star* factors, and it is not entirely clear which characteristics determined the court's ruling. It is noteworthy that the court quoted and apparently relied on a case in which it stated, "It is not thereby meant that the institution must dispense charity or that it may not charge a fee for services rendered." *Assembly Homes,* 273 Minn. at 204, 140 N.W.2d at 341 (quoting *State v. Browning,* 192 Minn. 25, 29, 255 N.W. 254, 256 (1934)). But the *Browning* case involved the "public hospital" tax exemption, not the purely public charity exemption. 192 Minn. at 26, 255 N.W. at 254. Some of the court's language in *Assembly Homes* suggested that all that was necessary to qualify for the purely public charity exemption was to serve a public, benevolent purpose on a nonprofit basis. To the extent that *Assembly Homes* stood for the proposition that an organization can be a purely public charity without providing goods or services free or at considerably reduced rates or can qualify for the exemption merely by serving a benevolent purpose on a nonprofit basis, it has been implicitly overruled by numerous subsequent cases discussed above, and today it is explicitly overruled to that extent.

In summary, there must be a substantial charitable, or gift, component to an organization's operation in order to qualify as an institution of purely public charity. That means the organization must provide a substantial proportion of its goods or services free or at considerably reduced rates. For that reason, if an organization does not satisfy the third *North Star* factor, it cannot qualify for tax exemption as an institution of purely public charity.

Applying these principles to this case, we hold that the tax court erred as a matter of law in concluding that Rainbow qualified for tax exemption as an institution of purely public charity during the years at issue despite failing to satisfy the third *North Star* factor. Because Rainbow did not prove that it provided child care services free or at substantially less than market rates or cost during 2004 and 2005, it was not an institution of purely public charity during those years and its property was not exempt from taxation. We therefore reverse the tax court's decision.

## II.

Because Rainbow failed to meet a threshold condition for qualification as an institution of purely public charity, we need not address any other aspects of the tax court's decision. However, we address the tax court's treatment of payments made to Rainbow by various counties and by the Prairie Island Tribal Community in order to provide guidance to the tax court and to the parties in future cases, particularly in light of the dissent's view that those payments could be treated as donations.

Rainbow received payments from various counties for care of children whose families qualified for child care assistance. Rainbow also received payments from the Prairie Island Tribal Community for care of children of its members. The tax court characterized these payments, amounting to at least 20% of Rainbow's operating resources in each of the tax years in question, as "public donations" and concluded

on that basis that factor two of the *North Star* analysis weighed in favor of status as an institution of purely public charity. Because these payments were made for services rendered by Rainbow to qualifying families, they should not have been classified as donations or contributions to Rainbow.

More than 40 years ago, in *Assembly Homes,* we held a nursing home to be exempt from property taxes as an institution of public charity whose "charges for services are paid for by individual patients, by county welfare boards, and by the U.S. Veterans Administration." 273 Minn. at 204, 140 N.W.2d at 341. But we did not explicitly characterize the payments from the county and federal governments as donations or gifts. In *Rio Vista,* we again addressed the status of an entity that received government payments. In that case, which involved a nonprofit corporation established to provide low-rent housing to families with low and moderate incomes, there were two different types of government payments. *Rio Vista,* 277 N.W.2d at 188. First, the facility was constructed under a federal housing program known as "section 236," under which the federal government guaranteed the construction loan. *Id.* Rio Vista made the principal payments on the loan and interest payments at the rate of one percent; the federal government paid to the lender the difference between the interest rate charged by the bank (seven percent) and the interest paid by Rio Vista. *Id.* Second, the federal government subsidized the rents of qualifying low-income tenants. *Id.* at 188–89. We agreed that the government assistance provided to Rio Vista qualified as "donations," noting that Rio Vista owed its "very existence" to the government's guarantee and funding of the low-interest construction loan and "significant rent assistance." *Id.* at 190–91. We stated that "[t]he fact that the donor is the Federal Government and not a private institution does not preclude a determination that Rio Vista is supported in part by donations." *Id.* Again, we did not distinguish between the government's interest subsidy and its rent subsidy.

But since *Rio Vista,* we have declined, both explicitly and implicitly, to classify government payments as "donations" when, like the rent subsidies in *Assembly Homes* and *Rio Vista,* they are direct payments for goods or services.[11] In *Chisago Health Services,* the health care clinic argued that it was exempt from payment of property taxes in part because it received 26 percent of its revenues from Medicare and Medicaid payments, monies the clinic argued should be counted as donations. 462 N.W.2d at 391. We declined to extend "the *Rio Vista* rationale" to treat the government's payments as donations, noting that "the government's payments under the Medicare and Medicaid programs are more accurately characterized as payments for services rendered, not as donations." *Id.* In *SHARE,* the fees charged by the health maintenance organization to its members covered by Medicare were largely paid by the Federal Health Care Financing Administration, but we did not characterize the federal agency's payments as donations, although federal grants awarded to the HMO to establish a health care program for low-income patients were treated as support from donations. 363 N.W.2d at 49–51. In *Community Memorial Home,* the rents of more than half of

11. In addition, we note that after *Rio Vista* the legislature amended the charitable tax exemption provision to expressly state that government rent assistance and financing assistance provided for low-income housing are not gifts or donations to the owner. *See* Minn.Stat. § 272.02, subd. 7 (2006).

the nursing home's residents were paid, in whole or in part, through grant programs administered by the county. 573 N.W.2d at 85. Again, we did not treat the county's payments as donations. Id. at 87 (concluding that the taxpayer had not sustained its burden of proof to show that it was supported by charitable donations despite accepting payments to care for county residents at less than market rates because the decision to do so "appears to be a business decision" designed to reduce the number of empty rental units).

■ To the extent any uncertainty remains as to the appropriate treatment of government payments, we hold that when the government pays directly for goods or services on behalf of one of its citizens, the payment is not considered a gift or donation for purposes of determining whether the entity providing the goods or services is exempt from property taxation as an institution of purely public charity.

Reversed.

Dissenting, HANSON, PAGE, and MEYER, JJ.

HANSON, Justice dissenting.

I respectfully dissent. I would affirm the well-reasoned decision of the tax court and hold that Rainbow qualifies for tax exempt status as an institution of purely public charity under Minn. Const. art. X, § 1 and Minn.Stat. § 272.02, subd. 7 (2006).

I appreciate the caution stated by the majority that we are not to apply an "overly rigid reliance on the six North Star factors," and I agree with the majority's criticism of some of our past cases for having done so. But I am disappointed that, ultimately, the majority does not heed that caution and, instead, regresses to a strict application of just one of the six North Star factors—relying on some of the very decisions that have fostered confusion.

More specifically, I do not agree that North Star factor three—"whether the recipients of the 'charity' are required to pay for the assistance received in whole or in part"—trumps all other factors. N. Star Research Inst. v. County of Hennepin, 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975) To the contrary, I believe that the question of whether an organization is a charity depends primarily on the nature of the service it provides and only secondarily on the type of funding mechanisms it uses to support that service. Because factor three addresses only one of many funding mechanisms that may be used by a nonprofit organization, it has limited materiality to the question of whether the organization is a charity.

Even if we were, for the first time, to give factor three such overwhelming importance, I believe that the majority has incorrectly applied that factor by focusing only on market rates and not cost. First, I do not believe that any true market rates can be determined for Goodhue County. Second, our cases allow the taxpayer to prove factor three on the basis of either market or cost, and Rainbow has proven that its rates are well below cost.

1. **How should the North Star factors be used?**

As I argued in the concurring opinion in Croixdale, Inc. v. County of Washington, the six factor test of North Star was designed to provide guidance in determining whether activities that were not traditionally viewed as being charitable could nevertheless qualify as charitable. 726 N.W.2d 483, 492 (Minn.2007) (Hanson, J., concurring). In North Star, we observed that, although an assessment of organizations that deal with traditional charitable

undertakings could be made by use of the six factors,

> [t]he tendency of our decisions has been to sustain exemption where these traditionally "charitable" objectives are being furthered, so long as no individual profits from ownership of the "charity" are realized and so long as the undertaking is not a subterfuge by which the needs of a select and favored few are accommodated.

*N. Star,* 306 Minn. at 6, 236 N.W.2d at 757.

There is no doubt that the objectives of Rainbow qualify as traditionally charitable. In *North Star* we identified traditional charitable undertakings as including "education of young people" and the promotion of the "moral and educational welfare of youth." *Id.* at 5–6, 236 N.W.2d at 756–57. Rainbow's articles of incorporation state that Rainbow is "organized exclusively for charitable, scientific, literary, or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code" and that the specific purposes of Rainbow are "to provide care of children away from their home within the meaning of section 501(k) of the Internal Revenue Code." One Rainbow witness expanded on these purposes by explaining that Rainbow is engaged in providing for "healthy development of young children so that they can be successful in school and later in life" and providing a "safe environment for children to be in when the[ir] parents are working." That witness also explained that the government placed a high value on child care services, because a small investment in child care assistance to low income families will produce a high social and economic return, allowing the parents to have consistency of employment, pay taxes, and contribute to the community, while assuring parents that their children are safe and are engaged in appropriate developmental activities. From this I conclude that Rainbow is surely providing services that are traditionally regarded as "charitable."

Further, Rainbow is organized so that no individual can profit from ownership of its assets. Although persons in control of some nonprofits may have abused the nonprofit status by extracting excessive salaries and benefits, that clearly has not occurred at Rainbow—where the Executive Director drew a salary of only $29,000 in 2005.[12] Although Rainbow has acquired some assets, those assets may only be used for the benefit of its charitable services and, on dissolution, they could not go to benefit any individual but must be transferred to another tax-exempt charity. And although some nonprofits may have also abused their nonprofit status by offering their services to only a select and favored few, that clearly has not occurred at Rainbow—where the public is welcome on a nondiscriminatory basis, with no restrictions on who can use the services. In fact, a significant percentage of the parents whose children are served at Rainbow are low income and qualify to receive county assistance. Although Rainbow works with low income parents to help them obtain public assistance, it also provides service to some children with no or lower fees. The statement in the tax court decision and the majority opinion that Rainbow "offers no scholarships" may be semantically true, but the uncontradicted testimony of Rainbow's Executive Director was that Rainbow has taken children without payment or for payment lower than the going rate, and that Rainbow writes off "several thousands of dollars in unclaimed child care payments every year."

12. The Executive Director's salary in 2003, the first year at the subject property, was $43,000 and in 2004 was $23,000.

Under *North Star*, the analysis could end right there and tax exemption should be recognized. But the tax court did not end the analysis there. The court made a thorough and reasoned review of all of the *North Star* factors. The tax court found that Rainbow was a nonprofit corporation that is exempt from federal and state income taxes; has not realized a profit in any year; meets its expenses by multiple funding mechanisms that include fees, grants, fundraisers, cash and in-kind donations of labor, and government payments; pays reasonable, non-excessive compensation to its employees; provides services to the general public, including low income families; uses its resources to provide benefits equally to all of the users of its services; and provides a service that has been recognized by the state as being important—increasing the availability of affordable child care services for low income families. The tax court found that Rainbow satisfied all but factor three and granted tax exemption.[13] The tax court's decision is persuasive and should be affirmed.

The majority opinion considers only factor three—whether the recipients of the service pay a fee—to be fundamental to the concept of charity. But, as *North Star* established years ago, the essence of a charity lies in the nature of the service provided, not in the funding mechanisms used to support that service.[14] The payment of fees for a charitable service is but one funding mechanism. Indeed, many charities are well advised to increase the portion of their funding that is self-supporting so they can avoid both the uncertainty of private donations and the time

and effort required to obtain them. Rainbow's Executive Director testified that it limited its requests for private donations to two annual fundraising events because it was concerned that it not "burn out [its] participants because there are so many fundraisers [for] schools and extracurricular programs" and it hoped to reduce the time spent fundraising so that it could maximize the time spent serving the children.

By focusing only on the fact that a charity charges a fee, the majority dilutes the goal of tax exemption. That goal is to encourage charitable services because, as we observed in *North Star*, "people will benefit in an economic sense from [a] charitable undertaking" that, among other things, provides an education that will enable a young person to "add more to the well-being of a society than one who is not so advantaged." 306 Minn. at 7, 236 N.W.2d at 757. A charitable undertaking can only contribute to the well-being of society if it has adequate funding to support its operations. From this perspective, it should not matter whether that funding is in the form of fees, grants, private donations, public payments or some combination of these. The state's legitimate concern with the use of fees for part of the funding is that it not produce excessive earnings, support excessive compensation, or enable the organization to serve a select and favored few. The record does not provide any basis for having those concerns about Rainbow.

### 2. What are "considerably reduced rates"?

The majority opinion states that a charity must "provide a substantial proportion

---

**13.** As discussed below, I conclude that the tax court applied factor three too narrowly and that factor three was also met. But even if factor three was not met, the grant of tax exemption is appropriate based on the other five factors.

**14.** Even the county's witness, a former assessor, acknowledged that the "charity" that low income families receive from Rainbow is the service it provides.

of its goods and services" to recipients "free of charge or at considerably reduced rates." The majority opinion then reduces that principle to a simple formula that compares Rainbow's published rates to the rates of two other child care centers to establish a "market rate."

None of our prior decisions gives such prominence to factor three. Instead, our decisions recognize factor three as only one part of a multipart test. Further, those cases have identified two *alternative* measures to satisfy factor three—market or cost. *E.g., Croixdale, Inc.,* 726 N.W.2d at 494. We have generally framed factor three in terms of whether recipients receive services at a rate "considerably less than market value or cost." *Cmty. Mem'l Home at Osakis, Minn., Inc. v. County of Douglas,* 573 N.W.2d 83, 87 (Minn.1997) (internal quotation marks omitted).

There is no dispute that Rainbow's rates are below cost, because it has operated at a loss in every year of its existence. Further, I would conclude that Rainbow's rates are also below the market value of its services.

## A. What are "market rates"?

We must be candid about the artificiality of any determination of "market rates" for Goodhue County. Rainbow provides services in Red Wing, where only three child care centers had been licensed on the assessment dates for the tax years in question.[15] This is a small sampling for establishing a "market." Further, all three are nonprofit, tax-exempt organizations. This raises several questions about the validity of determining market rates by simply comparing the rates of other child care centers. For example, if all three were to charge equal rates, would all three be denied tax exemption because none could

meet the majority's requirement that its rates be "considerably below market"? And, should the "market rate" be based on the actual rates charged by nonprofit organizations, which (like Rainbow) typically operate at low cost, benefiting from volunteer labor and donations to cover part of their expenses? If one nonprofit organization is able to subsidize its rates by private donations, do those subsidized rates nevertheless represent the "market"? Can we say that a rate is at "market" if it does not recover even the low nonprofit operating expenses, the organization operates at a loss, and the organization can only stay in operation because it receives private donations to make up the shortfall in operating income?

Perhaps the true "market rates" are those that would be charged by a for-profit corporation. But Red Wing did not have any for-profit child care centers and thus there is no evidence of a true market rate.

Finally, any comparison of rates of other providers should make adjustments for the differing cost levels incurred by each operation and, perhaps more importantly, differences in the type and quality of the services each provides. Rainbow is slightly larger than one of the day care centers and nearly twice as large as the other. And the next largest center has the benefit of being located in a church facility. As a result, one would expect that Rainbow would have greater space and staff needs, with correspondingly greater insurance costs.

Further, Rainbow's staff is capable of providing a greater range of services. As the Executive Director of the Child Care Resource's Referral Program testified, Rainbow has both English-and Spanish-speaking staff, whereas the other two centers have only English-speaking staff. He

---

15. A fourth center was added in 2006, after those tax assessments.

confirmed that this was an important factor with the growing Hispanic population. Further, he explained that Rainbow's staff has training and experience to serve a greater range of special needs. This witness also emphasized that Rainbow's infant care program is larger, being licensed for up to 16, while each of the other two were only licensed for up to 8. He explained that there is always a shortage of infant care because it is more expensive to provide and brings in less revenue due to the higher ratio of care givers to each infant.

Given these differences between the type and quality of the services provided, the rates of the other two centers cannot fairly be said to represent the market rate for Rainbow. Even so, Rainbow's rates compare favorably to them. Its hourly and daily rates are at or below the other two in every age category. Although its weekly rates are somewhat higher in some categories, this only reflects a difference in the degree of discount given to parents who are able to commit to full weeks.

The majority does recognize that Rainbow's rates are less than the county's maximum authorized rates but questions whether the tax court was correct in concluding that the county's maximum rates represent "actual market rates." I conclude that the county's maximum authorized rates are actually below market rates and that this would support the conclusion that Rainbow's rates were well below market.

The maximum rates for Goodhue County provided in the record are those effective July 1, 2006. Those rates were estab-lished through a rather tortured process. When Rainbow commenced operations at the subject property in 2003, the maximum rates were frozen at 2002 levels. Act of June 5, 2003, ch. 14, art. 9, § 34, 2003 Minn. Laws 1st Spec. Sess. 1751, 2137–38. Those rates remained frozen at 2002 levels through June 30, 2005. *Id.* Then, in 2005, the legislature set the maximum rates for the period July 1, 2005, through December 31, 2005, for counties like Goodhue at the greater of the 100th percentile of the rates shown in a 2002 provider rate survey or the rates identified in Department of Human Services Bulletin No. 03–68–07. Act of July 14, 2005, 1st Spec. Sess., ch. 4, art. 3, § 1, 2005 Minn. Laws 2454, 2525–26 (codified at Minn.Stat. § 119B.13, subd. 1(a) (Supp.2005)). Commencing January 1, 2006, the maximum rates were increased to the lesser of the 75th percentile for like-care arrangements in the county or the previous year's rates for like-care arrangements increased by 1.75 percent. *Id.* In 2006, the legislature increased the maximum rates in counties like Goodhue to the rates for like-care arrangements in the county effective January 1, 2006, increased by six percent. Act of June 2, 2006, ch. 282, art. 2, § 2, 2006 Minn. Laws 1194, 1197 (codified at Minn.Stat. § 119B.13, subd. 1(a) (2006)). From this history, I would conclude that the maximum rates for 2003 through 2006 were well below market rate.

In any event, Rainbow's rates compare favorably to the maximum rates authorized for 2006, with the most relevant comparisons being the full day and weekly rates:

| MAXIMUM RATES | | RAINBOW'S RATES | PERCENTAGE OF MAXIMUM |
|---|---|---|---|
| Infant Hourly | $ 5.40 | $ 5.50 | 102% |
| Full Day | $ 49.82 | $ 34.00 | 68% |
| Weekly | $167.48 | $142.00 | 85% |
| Toddler Hourly | $ 4.31 | $ 4.50 | 104% |
| Full Day | $ 43.14 | $ 30.00 | 70% |

| | | | |
|---|---|---|---|
| Weekly | $151.58 | $127.00 | 84% |
| Preschool Hourly | $ 4.31 | $ 4.25 | 99% |
| Full Day | $ 43.14 | $ 29.00 | 67% |
| Weekly | $146.28 | $121.00 | 83% |
| School Age Hourly | $ 4.24 | $ 4.00 | 94% |
| Full Day | $ 34.98 | $ 27.00 | 77% |
| Weekly | $143.10 | $112.00 | 78% |

Based on all of the comparisons noted above, I would conclude that the tax court understated the case when it found that Rainbow's rates were "at or just below market rates." I would conclude that Rainbow's rates were considerably below market and, accordingly, that Rainbow satisfied factor three.

### B. Are Rainbow's rates below cost?

Because of the difficulties in determining market rates, our decisions have turned to an alternative measure: are the rates below cost? This alternative measure does not present the difficulties inherent in the comparison between organizations that offer somewhat different services and have different costs.

It seems counter-intuitive to suggest that Rainbow's rates might be either above market or above cost where it has operated at a loss for its entire existence. Should a provider be expected to nevertheless reduce its rates, operate at an even greater loss, and hope that it will be able to make up the larger shortfall by private donations? Because the evidence shows that Rainbow pays reasonable salaries and incurs appropriate operating expenses, the fact that its rates still do not cover its costs suggests that the rates are sufficiently below cost to meet the factor three test.

More specifically, the comparison of Rainbow's operating income (loss) is as follows:

| | 2003 | 2004 | 2005 |
|---|---|---|---|
| Revenue from Rates | $386,863 | $468,073 | $496,644 |
| Operating Expenses | $430,390 | $480,930 | $525,211 |
| Net Operating Income (Loss) | ($43,527) | ($12,857) | ($28,567) |

These calculations include in revenue the payments made by Goodhue County; the Prairie Island Tribal Community; Pierce County, Wisconsin; and the Minnesota Food Program. According to our case law, these payments are more appropriately treated as contributions. *See, e.g., Rio Vista Non–Profit Hous. Corp. v. County of Ramsey*, 277 N.W.2d 187, 191 (Minn.1979) (holding that the rent assistance paid by the federal government should be treated as a "donation" for the second factor of the *North Star* test); *Assembly Homes, Inc. v. Yellow Medicine County*, 273 Minn. 197, 140 N.W.2d 336 (1966) (granting tax exemption to a nursing home even though the resident care was paid for primarily by the county and the Veterans Administration). This is especially true of the Minnesota Food Program, which does not reimburse for fees charged to parents, but instead for the cost of meals served.

Taking the Food Program payments out of revenues would increase the losses in each year by another $24,000. Taking all government payments out of revenues would increase losses by another $90,376

in 2003; $147,614 in 2004; and $121,663 in 2005.

Using this alternative measure, Rainbow's rates were considerably below cost and satisfy factor three of the *North Star* test.

PAGE, Justice dissenting.

I join in the dissent of Justice Hanson.

MEYER, Justice dissenting.

I join in the dissent of Justice Hanson.